UNITED STATES of America,
Plaintiff,

v.

John M. O'BRIEN and William Brian
McNeil, Defendants.

Crim. A. No. 66–268–J.

United States District Court
D. Massachusetts.

April 6, 1967.

Paul F. Markham, U. S. Atty., Albert F. Cullen, Jr., Asst. U. S. Atty., for the Government.

James F. Freeley, Jr., Boston, Mass., for defendant William Brian McNeil.

## OPINION

JULIAN, District Judge.

This case came on for an evidentiary hearing on the defendant McNeil's motion for the return of property and the suppression of evidence.

The defendants are charged in a two-count indictment with the theft of goods from a foreign shipment, and with receiving goods which they knew had been stolen from a foreign shipment. It is alleged that the defendants committed these offenses on or about August 5, 1966. The goods involved are 24 men's wool shirts consigned from Hong Kong to F. W. Woolworth Co., New York, N. Y., and 32 men's sport shirts consigned from Japan to Cristobal, Panama Canal Zone. These are the goods which the defendant McNeil seeks to have suppressed as evidence against him. He has waived the part of the motion in which he seeks the return of the property. The Government admits that the agents who seized the goods had no search or arrest warrant.

On the basis of the evidence presented I make the following findings of fact.

At approximately twenty minutes past ten on the evening of August 5, 1966, Customs Port Investigators Clain and Lally were assigned to the port at the Boston Army Base. Their duties involved surveillance of crews and longshoremen working on any ships docked in the area to enforce customs rules and regulations. At the time in question a Norwegian vessel called the M/V Troubadour had docked at berths 7 and 8 and was being unloaded by longshoremen. The cargo was being carried into the wharf shed, a long rectangular building which ran parallel to the dock with many large doors both on the side facing the water and on the opposite side facing inland.

The Boston Army Base is an enclosed area controlled by the United States Government. Entrance and exit are had through a gate situated near Summer Street. A small shelter situated in the center of the gateway divides it into two lanes. The lane on the right as one faces the gate from the outside is used as the entrance. The lane on the left is used as the exit. A Government officer stationed at the shelter checks persons and vehicles entering the Base. Only those who have been granted permission to enter are admitted. He does not check persons or vehicles leaving the Base. This was the situation at the time in question.

Agent Clain was sitting in an automobile parked within the area of the Army Base near the exit, observing the area through night binoculars, when he noticed a man coming from the direction of the wharf shed place a carton or case in the back of a station wagon that had been backed up to within 18 or 20 feet of the inland side of the wharf shed.

The station wagon was about 600 feet from where Clain was sitting, and the line of vision was unobstructed. Clain called to Lally, who was standing outside the car, and then saw a figure again placing a square object, about 3 feet by 1½ feet by 1½ feet, in the back of the station wagon. The agents knew that customs had not yet granted the necessary permit for the cargo unloaded from the Troubadour to enter the country. Lally got into the car with Clain, and the agents then saw the headlights of the station wagon come on. For the purpose of stopping the station wagon on its way out of the Army Base the agents drove their car in a U-turn and placed it at the left-hand side of the exit gate as one faces the Army Base from Summer Street. Clain got out of the car and stood by the left front fender so that the station wagon would have to pass beside him on its way out. As the station wagon approached him, Clain extended his right arm with his badge in his right hand. The area was lighted by electric lights from above, and the agent could see two men in the front seat and something bulky in the rear. As the station

wagon drew up beside Clain and it became obvious that it was not going to stop, Clain hollered "Halt." The station wagon speeded up through the gate and made a right turn on Summer Street in an attempt to elude the agents. Clain and Lally got into their automobile, turned on the siren, and gave chase. They overtook the station wagon about a sixth of a mile from the gate and brought it to a stop by turning their car into the front of the station wagon.

Clain asked the two men in the station wagon to get out and open the tail gate. When it was opened Clain looked under a covering in the rear and saw two large boxes with the markings "Made in Hong Kong" and "Made in Japan."

The two men in the station wagon were the defendants in this case. Clain asked McNeil for identification and he refused to show any. O'Brien was also asked for identification but he had none. The defendants were then asked to go to the customs office, and they complied. A check with the Registry revealed that McNeil was the owner of the station wagon. The two defendants remained at the customs office until 11:15 P.M., when they were driven by agents to a subway station to make their way home. The station wagon and its contents were seized by the customs agents while the defendants were at the customs office. The two boxes were opened before the defendants left the customs office and were found to contain 24 and 32 shirts, respectively.

### Conclusions of Law

The issue before the Court is whether or not the search and seizure were unreasonable and in violation of the rights of the defendant under the Fourth Amendment. On this depends the admissibility of the goods seized at the trial of the defendants.

■ The defendant claims and the Government concedes that the Government agents searched the vehicle and seized the goods in question neither pursuant to a search warrant nor incident to an arrest. The defendant contends that such search and seizure were violative of his constitutional rights under the Fourth Amendment. The burden rests on the Government to establish the validity of the search and seizure. Cervantes v. United States, 1959, 9 Cir., 263 F.2d 800, 805.[1]

I find that the search and seizure must be sustained as valid on each of two grounds:

First, the search was conducted by two Customs Port Investigators in the course of their duties. Under 19 U.S.C. § 482

"Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respec-

1. In the *Cervantes* case, a patrol inspector of the Immigration and Naturalization Service, who was also an authorized customs inspector, stopped the defendant while he was driving north from San Diego on U. S. Highway 101 on suspicion of carrying narcotics. A search of the defendant and his car was made without a search warrant and without an arrest. Narcotics were found on the defendant's person and in the car, and this evidence was introduced at trial after denial of the defendant's motion to suppress. The defendant was convicted of illegally importing, transporting and concealing narcotics. The Court of Appeals for the Ninth Circuit reversed the conviction, holding, inter alia, that after a motion to suppress, the burden is on the Government to show "probable cause" for the search and seizure without an arrest or search warrant. See also Wrightson v. United States, 1955, 95 U.S.App.D.C. 390, 222 F.2d 556, (on motion to suppress, the burden is on the Government to show that there was probable cause to make the arrest, which the Government claimed validated the search); Wren v. United States, 1965, 10 Cir., 352 F. 2d 617, cert. denied, 384 U.S. 944, 86 S.Ct. 1469, 16 L.Ed.2d 542 (on motion to suppress, the burden is on the Government to show that the defendant voluntarily consented to the search of his automobile).

tive districts, any vehicle \* \* \* on which \* \* \* he \* \* \* shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law \* \* \* ; and if any such officer or other person so authorized shall find any merchandise on or about any such vehicle \* \* \* which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States \* \* \* he shall seize and secure the same for trial."

Under 19 U.S.C. § 1581, "any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters \* \* \* and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance."

■■■ I find that Customs Port Investigators Clain and Lally were persons authorized to board and search vessels within the meaning of 19 U.S.C. § 482, and officers within the meaning of 19 U.S.C. § 1581.

■ Under section 482 no search warrant is necessary to stop and search a vehicle. The suspicion that goods have been brought into the country unlawfully is sufficient. It has been stated that "the search which customs agents are authorized to conduct upon entry is of the broadest possible character and any evidence received might be used." Landau v. United States Attorney for the Southern District of New York, 1936, 2 Cir., 82 F.2d 285, 286. See also Alexander v. United States, 1966, 9 Cir., 362 F.2d 379, and cases therein cited. And, further,

"In the case of excisable or dutiable articles, the government has an interest in them for the payment of the duties thereon, and until such duties are paid

has a right to keep them under observation, or to pursue and drag them from concealment."

King v. United States, 1958, 5 Cir., 258 F.2d 754, 756, cert. denied, 359 U.S. 939, 79 S.Ct. 652, 3 L.Ed.2d 639. See Ng Pui Yu v. United States, 1965, 9 Cir., 352 F.2d 626.

■ In the present case the customs agents saw boxes loaded into a vehicle by men coming from the direction of the wharf shed. Cargo which the agents knew had not yet cleared customs was at that time in the process of being unloaded from a foreign ship into that wharf shed in the immediate area of the vehicle. As the vehicle was about to leave the Base, the command to halt was given by an agent displaying a badge. Instead of coming to a stop the driver accelerated the speed of the vehicle in an attempt to get away and had to be chased. These circumstances clearly afforded sufficient grounds for suspicion justifying the agents to stop and search the vehicle under section 482. When the search revealed cartons with the legends "Made in Hong Kong" and "Made in Japan" the agents had "reasonable cause to believe" the goods to be "subject to duty, or to have been unlawfully introduced into the United States," 19 U.S.C. § 482, and were justified in seizing them.

A second, more general theory was enunciated in the case of Carroll v. United States, 1925, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. That case involved the search of an automobile for liquor in enforcement of the National Prohibition Act. The Court held that

"On reason and authority the true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure \* \* \* the search and seizure are valid." Id. at 149, 45 S.Ct. at 283.

957

The Court explained that

"The search for and seizure of * * * goods liable to duties and concealed to avoid the payment thereof, are totally different things from a search for and seizure of a man's private books and papers for the purpose of obtaining information therein contained, or of using them as evidence against him. The two things differ *toto coelo*. In the one case, the government is entitled to the possession of the property; in the other it is not." Ibid.

"The guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." Id. at 153, 45 S.Ct. at 285.

In 1959, in the case of Henry v. United States, 361 U.S. 98, 104, 80 S.Ct. 168, 172, 4 L.Ed.2d 134, the Supreme Court again stated that the *Carroll* decision had "liberalized the rule governing searches when a motor vehicle is involved" but that "probable cause" was still a requisite.

I find that on the facts stated above, the Customs Port Investigators, at the time they brought the station wagon to a stop on Summer Street, had probable cause to believe that the station wagon contained goods that had not been cleared by customs for entry into the country. I conclude, therefore, that the search and seizure were reasonable and did not violate the constitutional rights of the defendant under the Fourth Amendment. The motion for suppression of evidence is accordingly denied.