**UNITED STATES of America, Plaintiff,**

v.

**Jean BERARD, also known as Jean Francois Bouillon, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**Giovanni LAI, also known as Salvatore Lamanna, Defendant.**

**Crim. A. Nos. 67–305, 67–306.**

United States District Court
D. Massachusetts.

March 11, 1968.

Paul F. Markham, U. S. Atty., Albert F. Cullen, Asst. U. S. Atty., for plaintiff.

Bernard J. Dwyer, Boston, Mass., for defendants.

## OPINION

JULIAN, District Judge.

This matter came before the Court on the identical motions of both criminal defendants to suppress certain physical evidence and certain incriminating statements allegedly made by them. Evidence was received in a two-day hearing at which defendants were represented by counsel.

Since neither defendant speaks English but both are fluent in French, the Court appointed an interpreter who not only assisted the defendants in conferring with their counsel but who also translated simultaneously for them into French all that was said at the hearing.

Each defendant is charged in a separate indictment with fraudulently and knowingly importing and bringing into the United States approximately three kilograms of heroin, in violation of 21 U.S.C. Section 174.

On the basis of the evidence presented I make the following findings of fact.

On the evening of October 24, 1967, Customs Port Investigators Killeen, DiGiampaolo, Gouliaski, Roberson, and Uliano were assigned to the international section of Logan International Airport in Boston. Their duties included surveillance of persons arriving in the United States on international flights in order to enforce customs laws and regulations.

The international section of Logan Airport consists of a second story, where all incoming passengers on international flights are inspected by personnel of the United States Public Health Service, and a lower level consisting of a large room containing immigration counters, baggage carousels, and customs inspection counters. Connected to this large room are two separate, but adjoining, personal search rooms.

Incoming passengers who have been cleared through the Public Health section descend to the lower level where, after passing through immigration counters where passports are produced and examined, they proceed into the center of the large room, claim their baggage from either of two carousels, and then pass through one of several counters where customs officials inspect their baggage. Egress from this room can be had only through a single exit leading into the public sections of the airport. Access to this international section is restricted to federal public health, immigration and customs personnel, certain airline employees, and passengers on incoming international flights.

At about 8:15 P.M. on October 24, 1967, Customs Port Investigator Killeen was standing, in plain clothes, within the international section observing newly arrived international passengers as they passed through the immigration counters. Killeen, whose purpose was to detect violations of customs laws and regulations, noticed defendant Berard as Berard passed through the immigration counter. Killeen's attention was attracted to Berard by the stiffness of his bodily movements as he bent forward to lift his luggage from the carousel and by the bulges on his body. Killeen therefore moved to the exit which led into the international section of the airport. As Berard, after passing through a baggage inspection counter, approached the exit, Killeen approached him, displayed his badge, and in English identified himself as a customs officer. Berard responded by asking that Killeen speak in French or Spanish. Killeen asked, in German, if Berard spoke German. Having failed to find a common language, Killeen, proceeding through a combination of English and gestures, asked to inspect the pocket of the topcoat over Berard's arm. Berard handed over the topcoat, but Killeen's examination of it revealed nothing.

Killeen then pointed to Berard's midriff and asked what Berard had around his body. In the process of pointing, Killeen felt on Berard's body something which, he testified, felt like tape. Berard indicated what Killeen understood to mean that Berard was sick. Killeen at some point in this exchange requested, and received from Berard, the latter's passport. The investigator then, with the aid of gestures, escorted Berard to one of the two personal search rooms within the international area.

At approximately this time (between 8:20 and 8:25 P.M.) Customs Port Investigator DiGiampaolo, who also was observing international passengers as they passed through the immigration counters, noticed defendant Lai, who appeared very nervous and fidgety, and whose overcoat pocket bulged. Investigator DiGiampaolo also overheard Lai mention the Boston Hotel. After observing Lai proceed to the baggage carousel and claim his bag, DiGiampaolo instructed Customs Port Investigator Charles Gouliaski, who was stationed in uniform near the exit, to intercept and

detain Lai before Lai left the international section.

After observing Investigator Gouliaski do this, Investigator DiGiampaolo proceeded to a personal search room, where Berard was being detained. Once there, DiGiampaolo examined Berard's passport, noticed that the United States address therein listed was the "Boston Hotel," and immediately left the personal search room to get defendant Lai, whom Investigator Gouliaski had already detained.

When Investigator Gouliaski stopped defendant Lai near the exit and started with him toward the personal search room, they were joined by Customs Port Investigator Uliano. The only conversation with Lai at this time consisted of Gouliaski's inquiry whether Lai spoke English, to which Lai shook his head, "No," and Uliano's demand that Lai empty his pockets, which Lai did. The pockets contained two paper boxes each containing vials filled with white powder.

At this time Investigator DiGiampaolo arrived and, in Italian, asked Lai if the latter understood Italian. Lai responded that he did. DiGiampaolo then asked Lai what the vials contained, and Lai responded in Italian that they contained medicine. Lai also said that he had brown pills which were medicine, and in response to a further question said that he had no "needles" on his person. This was the extent of the conversation at that time. Lai was escorted into a personal search room by Investigators Uliano and Roberson, while Gouliaski and DiGiampaolo went ahead to conduct identification tests on the powder in the vials.

Once Lai was in the personal search room, Investigator DiGiampaolo asked him, in Italian, to remove his outer jacket, which Lai did. DiGiampaolo then saw distinct bulges beneath Lai's shirt. Upon the investigator's further request, Lai removed his shirt, revealing that his entire trunk, from waist to armpits, was encased in white tape. Protruding from the tape were a number of transparent plastic bags, each containing white powder. DiGiampaolo asked the defendant what was contained in the packages, and Lai responded, "Heroin."

During this time defendant Berard was being detained in a separate, adjoining personal search room. Shortly after arriving in the room with Berard, Investigator Killeen, in the company of DiGiampaolo, asked Berard to remove his coat and open his shirt. Berard complied. Killeen then "frisked" Berard in a search for concealed weapons, but found none. Berard's open shirt, however, disclosed that he, like Lai, was bound in tape from waist to armpits. Transparent plastic bags protruded from the tape. Killeen asked Berard what he had strapped to his body, to which question Berard shrugged, indicating that he did not understand the question.

The defendants were then directed to wait in one of the search rooms, while Investigator DiGiampaolo telephoned Customs Agent Desmond at the Custom House in Boston.

Up to this time neither defendant had been advised of his rights.

Agent Desmond, who cannot speak Italian or French, arrived at the scene approximately fifteen minutes later, at 9:00 P.M. Upon ascertaining through Investigator DiGiampaolo that defendant Lai understood Italian and that Lai and Berard could communicate in French, Agent Desmond, in English, asked DiGiampaolo to advise defendant Lai, in Italian, that he was under arrest[1] for smuggling narcotics into the United States. Agent Desmond also directed DiGiampaolo[2] to ask Lai to translate a similar message, in French, to defendant

---

[1.] It is clear from the evidence that neither defendant would have been permitted to leave the personal search room or the international section of the airport, had they tried, after they were detained.

[2.] The evidence relating to DiGiampaolo's knowledge of Italian is too meager to enable the Court to determine the degree of his competence as an interpreter in that language.

Berard. Lai purported to do so. This trilingual chain was used throughout the conversation that followed.

Agent Desmond then directed DiGiampaolo to advise both defendants by this method that they did not have to make any statement and that any statement they might make would be used against them, possibly in court. Desmond asked through DiGiampaolo if they understood, and both defendants nodded that they did. Desmond further directed DiGiampaolo to advise both defendants that they had a "right to counsel" and that if they "could not afford counsel [that] one [would] be appointed by the court for [them]." That was the extent of the warning given at this time to the defendants and was the only warning given to defendant Lai.

Lai responded to this by stating that he wanted to have counsel. He also said, however, that he was willing to tell Agent Desmond what he had intended to do with the drugs. After the agents cut the tape and plastic bags from his body, Lai, in the presence of Berard, proceeded to tell Desmond through DiGiampaolo of an elaborate plan by which Lai, wearing a hat, displaying a red handkerchief, and carrying a French newspaper, was to have delivered the heroin to a contact in front of the Air France counter at the airport.

It is clear from the evidence introduced at the hearing that the defendants were jointly engaged in the execution of a plan to smuggle heroin into the United States. The evidence also shows that Berard speaks both French and Spanish. On the basis of these facts and because of the similarity of these two languages, particularly Spanish, to Italian, the inference is warranted, and I find, that Berard understood the purport of the incriminating statements made in Italian by Lai to the agents in the search room.

During the time that Desmond, through DiGiampaolo, was advising the defendants of their rights, Customs Agent Robert J. Grant arrived at the personal search room. Grant, who had studied Spanish as a hobby for several years, ascertained from Berard that Berard spoke Spanish. No further conversation ensued at that time.

Agent Desmond inspected the articles which had been removed from the defendants, including a French passport for each defendant, several hundred dollars in cash apiece, and airline tickets in their names indicating that they had arrived on Pan American flight 149 from Lisbon. Desmond also telephoned an Assistant United States Attorney, at the latter's home, and reported the arrest.

At about 9:45 P.M., ten minutes after Lai concluded his account of how he had planned to dispose of the drugs, the agents escorted both defendants from the personal search room to government vehicles and drove them to the Custom House in Boston. As they left the international area, defendant Lai said to Agent Desmond, through Inspector DiGiampaolo, that he lacked the money necessary to hire an attorney. DiGiampaolo advised Lai that "the court" would appoint an attorney for him. Lai also asked Desmond what the penalty would be, adding that he "had been told" that he would get about one and a half years in jail. Desmond replied that he had nothing to say about the severity of the sentence, that this was a matter for the United States Court to decide. Lai also asked DiGiampaolo where they were going and who had "tipped them off."

Defendant Berard was accompanied on the trip to the Custom House by Agent Grant and Investigator Killeen. As he was being escorted from the personal search room to the awaiting vehicle, Berard asked Grant who had informed on them. Grant replied, "No one." Grant then asked Berard where he had learned to speak Spanish, and Berard replied that he had learned the language in France and during a six-month visit to Argentina. While en route to the Custom House Berard asked Grant where they were going, and Grant replied, "to our office." This conversation was in

Spanish. There was no other conversation en route.

Upon their arrival at the Custom House Lai gave Investigator DiGiampaolo information concerning his personal history, but then stated, as he was being fingerprinted, that he did not want to make any more statements without an attorney present. He was not questioned further.

Once at the Custom House, Agent Grant took defendant Berard into a separate room. Grant advised Berard in Spanish that he did not have to say anything, or make any declaration or answer any questions. Grant also told Berard that he had the right to have an attorney of his own selection to counsel and help him, and that if he could not afford to pay for the services of an attorney, the government would obtain one for him and pay for the attorney's services. Grant also told Berard that he had a right to have the attorney with him at his side before he answered any questions and that if he said anything voluntarily to Grant it would be used against him at a trial at a later date.

Berard stated that he was going to obtain an attorney but was willing, at the present time, to tell Grant all he knew about the matter.

Berard then related, in detail, how he had been engaged in Paris to carry the heroin, how he had enlisted Lai in the plan, how much they had been paid already and were additionally to have received upon their return to France, how they had proceeded separately to Madrid and together to Lisbon, how in Lisbon they had purchased their tickets to Boston, how they had contacted the person who supplied the heroin, where they had gone to be taped for the journey, how they were to have disposed of the heroin in Boston according to regular and an alternate plan, and how they had intended to return to Paris via Miami.

When Berard concluded this story he was fingerprinted, after which both defendants were fed and then taken to the South Boston police station for detention overnight.

In their motions to suppress, both defendants contend that all property taken from their persons at the airport by customs agents and investigators should be suppressed because their arrests and the searches of their persons were unlawful. Both defendants also contend that all statements made by them are inadmissible at trial because they were not advised of their right to remain silent, or of their right to stop talking at any time, or of their right to consult with and be represented by counsel.

■ I conclude that the search of the defendants' persons and the ensuing seizure of the heroin were valid since the search and seizure constituted a "border search" conducted by Customs Port Investigators in the course of their duties.

■ Investigators Killeen, DiGiampaolo, Gouliaski, Roberson, and Uliano, as well as Agents Desmond and Grant, were all officers of the customs within the meaning of 19 U.S.C. § 1581. As such, they were authorized to board and search vessels [3] and were also authorized by 19 U.S.C. § 482 to stop and search any person whom they suspected had introduced any merchandise into the United States unlawfully. Under the same statute they were required to seize any merchandise discovered in the course of such a search which they had reasonable cause to believe had been so introduced into the country.[4]

3. 19 U.S.C. § 1581, in pertinent part, provided:
"Any officer of the customs may at any time go on board of any vessel * * * and examine, inspect, and search the vessel * * *."

4. 19 U.S.C. § 482, in pertinent part, provided:
"Any of the officers * * * authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts

██ ██ As this Court held in United States v. O'Brien, D.C., 1967, 265 F.Supp. 953, 956, a stopping and search pursuant to section 482 by a customs officer in the course of his duties is valid despite the absence of a search warrant. The suspicion that goods have been brought into this country unlawfully is sufficient to justify the search. Thomas v. United States, 5 Cir., 1967, 372 F.2d 252, 254; Alexander v. United States, 9 Cir., 1966, 362 F.2d 379, 382, cert. denied, 1966, 385 U.S. 977, 87 S.C. 519, 17 L.Ed.2d 439; Rodriquez-Gonzalez v. United States, 9 Cir., 1967, 378 F.2d 256; see Rivera v. United States, 1 Cir., 1964, 327 F.2d 791, 792.

██ ██ This special standard applicable to "border searches" reflects Congressional recognition of the "difficult problems of effectively policing our national boundaries," Thomas v. United States, supra; Morales v. United States, 5 Cir., 1967, 378 F.2d 187, 189, and merely extends a legislative policy dating back to 1789. See Carroll v. United States, 1925, 267 U.S. 132, 150–154, 45 S.Ct. 280, 69 L.Ed. 543. Unlike the more conventional Fourth Amendment search, a border search by customs officials is valid despite the absence not only of a search warrant but also of an arrest. Lowery v. United States, 9 Cir., 1943, 135 F.2d 626. In short, customs officers may conduct a search of the "broadest possible character." Landau v. United States Attorney for the Southern District of New York, 2 Cir., 1936, 82 F.2d 285, 286.

██ It follows that where, as here, the defendants' arrest without a warrant followed this lawful search and seizure and was thus incidental thereto, there was ample probable cause to justify the subsequent arrest.

There remains the question whether the incriminating statements made by the defendants should be suppressed because they were not "adequately and effectively" apprised of their rights. Miranda v. State of Arizona, 1966, 384 U.S. 436, 437, 86 S.Ct. 1602, 16 L.Ed. 2d 694.

██ Defendant Lai's admission that the material strapped to his body was heroin was made in response to a question put to him by one customs officer after he had been detained by a second officer, questioned briefly, and then taken to a personal search room by still two more investigators. He had at their direction partially disrobed. He would not at that point have been permitted to leave had he tried. At that point he had been deprived of his freedom of action in a significant way so as to make this a "custodial interrogation" within the meaning of *Miranda,* supra, at 444, 86 S.Ct. at p. 1612. The "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Lai had not been advised of his rights at the time he was asked what was contained in the packages taped to his body. Therefore his reply that they contained heroin must be suppressed.

██ Similarly Lai's detailed statement to Agent Desmond through investigator DiGiampaolo is inadmissible and therefore ordered suppressed. For although Desmond undertook to advise the defendants of their rights prior to

any * * * person, on * * * whom he * * * shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law * * *; and if any such officer * * * shall find any merchandise on or about any such

* * * person * * * which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession * * * or otherwise, he shall seize and secure the same for trial."

this statement, he did not do so adequately. Specifically, Agent Desmond failed to advise the defendants that they had the right to consult a lawyer and to have the lawyer with them during the interrogation. The Supreme Court in Miranda, supra, at 471–472, 86 S.Ct. at p. 1626, explicitly stated the necessity of this warning:

"Accordingly we hold that an individual held for interrogation must be clearly informed that he has a right to consult with a lawyer *and to have the lawyer with him during interrogation* under the system for protecting the privilege [against self-incrimination] we delineate today. * * * [*T*]*his warning is an absolute prerequisite to interrogation.* No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead." (Emphasis supplied)

It was not sufficient merely to advise the defendants that they had a "right to counsel" and that, if they could not afford counsel, one would be appointed for them "by the court." The reference to a court implied a happening in the future. Moreover, this reference to a court followed the only other reference to a court, in connection with the warning that statements made might be used against them "possibly in court," in which the reference to the future was even stronger. Nothing was said which even hinted at the right to have counsel during interrogation.

Desmond's warning also failed to mention that if the defendants could not afford counsel they had a right to have an attorney provided for them prior to any interrogation. The necessity of this warning was made plain by Miranda, supra, at 474, 86 S.Ct. at 1628:

"[I]f police propose to interrogate a person they must make known to him that he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him prior to any interrogation."

In the absence of these warnings this Court cannot construe Lai's statement that he was willing to talk as a waiver of his right to consult with counsel prior to making a statement. Carnley v. Cochran, 1962, 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed.2d 70; see also Glasser v. United States, 1942, 315 U.S. 60, 70, 62 S.Ct. 457, 86 L.Ed. 680. Such a conclusion is precluded by what is stated in Miranda, supra, 384 U.S. at 470, 86 S.Ct. at 1626:

"No effective waiver of the right to counsel during interrogation can be recognized unless specifically made after the warnings we here delineate have been given."

Lai's and Berard's incriminating admissions and questions on the way to the Custom House as well as any incriminating information acquired from them after their arrival there are also suppressed. These were causally related to the earlier illegally obtained admissions of Lai and were the product of a continuing process of custodial interrogation extending without significant interruption over a period of about two and a half hours.

The defendants' motions to suppress are denied as to the physical evidence seized at the airport. The motions are granted as they relate to statements made by the defendants on October 24, 1967.