**UNITED STATES of America, Appellee,**

v.

**George Andrew SCALF, Appellant.**

**No. 82–2435.**

United States Court of Appeals,
Tenth Circuit.

Jan. 24, 1984.

Karla McAlister, Asst. U.S. Atty., W.D. Okl., Oklahoma City, Okl. (William S. Price, U.S. Atty., Oklahoma City, Okl., with her on brief), for appellee.

Paul Walters of Spradling, Alpern, Friot & Gum, Oklahoma City, Okl., for appellant.

Before BARRETT and LOGAN, Circuit Judges, and CHILSON,* Senior District Judge.

BARRETT, Circuit Judge.

George Andrew Scalf (Scalf) appeals his jury convictions on the charges of assault

---

* The Honorable Hatfield Chilson, Senior Judge, United States District Court for the District of Colorado, sitting by designation.

with a deadly weapon, 18 U.S.C.A. § 113(c), and conveying a weapon from place to place within a federal penitentiary, 18 U.S.C.A. § 1792. A summary of the undisputed facts will facilitate our review.

On August 28, 1982, Scalf, along with a number of other inmates, including Jerome Spence (Spence) were housed in Cell House B, a disciplinary segregation unit of the Federal Correctional Institution, El Reno, Oklahoma. Spence had been placed in segregation the day before and Scalf had been in the unit for approximately one month. Scalf was serving as the unit's "range cleaner" and was responsible for picking up eating trays and mopping the floors. As a range cleaner, Scalf had more freedom than the other inmates in segregation; his cell was unlocked most of the time.

At approximately 10:00 a.m., while Scalf was outside his cell, Officer Roberts opened the segregation cells, releasing Spence and several other inmates for their recreation period. Spence exited his cell and walked toward the recreation area, when Scalf attacked him with two handmade "knives." Although Spence attempted to run away, Scalf chased Spence and stabbed him "5 or 6" times. Officer Roberts observed part of this incident and commanded Scalf to "hold it." Scalf then returned to his cell. The "knives" used by Scalf were "little round spikes" approximately ten to twelve inches long. Scalf had made them the night before by tearing a piece of metal off a mop bucket, breaking the metal into several pieces, and then sharpening the ends of the metal on the cement floor of his cell.

Immediately after the incident, Officer Roberts locked all the inmates in their cells. Officer Sanchez, a security officer, joined Officer Roberts, and after being told that Scalf had stabbed Spence, Officer Sanchez went to Scalf's cell. From outside the cell, Officer Sanchez asked Scalf "what was going on, what the problem was." Officer Sanchez testified that Scalf said he did not want to have any problem with the officers and that he did "not like that nigger [Spence]." Scalf told Officer Sanchez that he had thrown the two knives out a win-

dow. However, the knives were found in Scalf's commode after the officers searched his cell twice.

At trial, the government developed the attack in detail through the testimony of Spence, several officers including Roberts and Sanchez, and FBI Agent Cincotta who investigated the incident. Officer Sanchez was allowed to testify, over Scalf's *Miranda*-based objection, relative to his brief conversation with Scalf shortly after the attack.

Scalf's defense, developed by his own testimony and that of several other inmates, was self-defense. Scalf testified about certain facts to establish self-defense: Spence had made homosexual advances toward him; he was afraid of Spence; and he attacked Spence because he felt Spence would get him if he did not attack Spence. Scalf admitted that he chased Spence and stabbed him five or six times and that Spence made no moves toward him at the time he stabbed him. Scalf also acknowledged that at no time did he relate his fear of Spence to the penitentiary officials or seek their help; Spence had never touched him; and he knew he was not permitted to have the knives.

Agent Cincotta testified on rebuttal for the government. He stated that he had observed Spence's puncture wounds and that they were consistent "with being stabbed from the back from behind". In addition, he testified that during the time he was investigating the incident there were no indications that any homosexual advances were made.

The district court refused to give Scalf's proffered self-defense jury instruction, which read in part: "A person is justified in the use of force when he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force." The court's self-defense instruction, as given, read in part: "Even though a person may be justified in using force in self-defense, he is not entitled to use any greater force than he had reasonable ground to believe and actually did believe to be necessary under the circumstanc-

es to save his life or avert serious bodily harm."

On appeal Scalf contends: (1) the admission of his statement to Officer Sanchez, obtained without the procedural safeguards of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), violated his privilege against self-incrimination; and (2) the district court erred by refusing to give the self-defense jury instruction that he requested.

## I.

Scalf contends the district court erred in admitting the statement he made to Officer Sanchez shortly after the stabbing because the statement was obtained without the procedural safeguards of *Miranda v. Arizona, supra,* and violated his privilege against self-incrimination.

As set forth, *supra,* Officer Sanchez spoke briefly with Scalf shortly after the stabbing. After testifying that his function at the penitentiary was security and that he did not undertake investigations or interrogations, Officer Sanchez testified relative to his conversation with Scalf:

Q. What statement did you make to him?

A. I asked him what was going on, what the problem was.

Q. Did he respond to you?

A. Yes, he did.

Q. What was his response?

A. He responded by saying, "I don't want to have any problems with you guys," meaning the officers.

Q. Okay. Did he make any response after that?

A. He indicated that he did not like that nigger.

Q. Okay. Did you ask him any other question?

A. Yes.

Q. What other question did you ask him?

A. I asked him what he did with the knife.

Q. What did he indicate to you?

A. He told me that he threw them out the window.

Q. Did he indicate to you how many knives he had?

A. Yes, he did.

Q. How many?

A. Two.

Q. What was your concern when you went down to Inmate Scalf's cell?

A. I didn't know what had happened. I didn't know whether he was injured, or whether any other inmates were injured, just to find out what was going on with him.

Q. So, you were not conducting an investigation?

A. No.

Q. Were you also trying to find the weapons?

A. Yes.

Q. Since part of your duty is security at the institution?

A. Yes, sir.

Q. At the time you talked to Inmate Scalf, was he in custody or under arrest for this incident?

A. No, he was the same as any other inmate, just locked in the cell.

Q. If he had been in custody or under arrest for the incident, what procedure would have been followed?

A. He would have been taken out of his cell, strip searched, and moved down to the first floor, which is in the holding cell where we move them after something like that.

[R., Vol. III at pp. 74–75].

On cross-examination Scalf testified:

Q. When Mr. Sanchez—Officer Sanchez came down to talk to you after the incident, didn't you tell him, in your words, you didn't like that nigger?

A. No, I didn't.

Q. You didn't say that?

A. No, I didn't.

Q. What did you say to him?

A. I did tell him I had two knives, and I did tell him I threw the two knives out the window, but I did tell him that I

didn't want no problems, but at that time I didn't like niggers.

Q. Well, haven't you since that time even told him that more times since the incident occurred? Haven't you told him that you don't like Black people?

A. Yes, I have told him that.

[R., Vol. III at pp. 104–105].

In ruling that the conversation was admissible, the district court, relying upon *Cervantes v. Walker,* 589 F.2d 424 (9th Cir. 1978), stated:

It is undisputed that he was asked, "What's the trouble?" or, "What's going on?" By a correctional officer who is not an investigator. It is undisputed that that correctional officer asked the question while in the hallway, through the bars, to the defendant who was in his cell. It was not part of an investigation or even an administrative inquiry, such as is the procedure and custom in the institution.

It is undisputed that the defendant had been the subject of and exposed to investigative procedures in the past at that institution, and can be presumed to have known the difference between this circumstance and any official inquiry or more coercive or specific investigation of a problem involving him or others.

Accordingly, it is my judgment that under all of these facts and circumstances the Miranda warning was not required, and that the statement of the defendant is admissible in this trial absent the Miranda warning.

[R., Vol. III at pp. 80–81].

■ We hold that the district court did not err in ruling that the conversation was admissible and that the *Miranda* warnings were not required. We agree with the district court's reliance on *Cervantes v. Walker, supra.*

In *Cervantes v. Walker,* the court held that a conversation between a guard and an inmate, arising during a routine search in which marijuana was discovered, was admissible absent *Miranda* warnings:

In response to Cervantes' recent involvement in a fight with another inmate, Sheriff's Deputy Jopes moved Cervantes from one jail cell to another. Jopes directed Cervantes to get his belongings and then took him to the jail library so the shift commander, Sergeant Ingle, could talk with him before the move. Cervantes left his belongings on a table outside the library door and entered the library. Jopes then searched the belongings in accordance with standard jail procedure when moving inmates. He found a small matchbox containing a green odorless substance.

The deputy testified that he suspected the substance was marijuana. He did not definitely know, however, as he had no specific training in identifying marijuana. Jopes took the matchbox and contents into the library in order to have Cervantes identify the substance. The library dimensions were about six feet by four feet. In the presence of Ingle, and at a distance of about one and one-half feet to two feet from Cervantes, Jopes opened the matchbox, showed the contents to Cervantes and asked, "What's this?" Cervantes replied, "That's grass, man." Jopes then placed Cervantes under arrest. The matchbox contained a usable quantity of marijuana.

589 F.2d at pp. 426–27.

The court then concluded as follows:

We agree that Jopes' questioning was not an instance of custodial interrogation. The marijuana was uncovered in the course of a routine search. Jopes' question sought to ascertain the nature of the substance. The questioning took place in the prison library and appears to have been a spontaneous reaction to the discovery. Under these circumstances, we also conclude that neither the prison setting nor the presence of Jopes and Ingle exerted a pressure to detain sufficient to have caused a reasonable person to believe his freedom of movement had been further diminished. Rather, this was an instance of on-the-scene questioning en-

abling Jopes to determine whether a crime was in progress . . . .

*Id.* at p. 429

Officer Sanchez' conversation with Scalf was, as in *Cervantes v. Walker,* nothing more than an "on-the-scene" inquiry to find out what had happened, to determine who had been injured, and to find the weapons used in the attack in conjunction with his security responsibilities at the penitentiary. Officer Sanchez' conversation with Scalf was not an interrogation under *Miranda* or subsequent opinions construing it. In *Rhode Island v. Innis,* 446 U.S. 291, 298–99, 100 S.Ct. 1682, 1688–89, 64 L.Ed.2d 297 (1980), the court opined:

> The starting point for defining "interrogation" in this context is, of course, the Court's *Miranda* opinion. There the Court observed that "[b]y custodial interrogation, we mean *questioning* initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* [384 U.S.], at 444 [86 S.Ct. at 1612] (emphasis added). This passage and other references throughout the opinion to "questioning" might suggest that the *Miranda* rules were to apply only to those police interrogation practices that involve express questioning of a defendant while in custody.
>
> We do not, however, construe the *Miranda* opinion so narrowly. The concern of the Court in *Miranda* was that the "interrogation environment" created by the interplay of interrogation and custody would "subjugate the individual to the will of his examiner" and thereby undermine the privilege against compulsory self-incrimination. *Id.,* at 457–458 [86 S.Ct., at 1618–1619] . . . .

Officer Sanchez' conversation with Scalf did not give rise to an "interrogation" under *Miranda* or its progeny. "General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding." *Miranda, supra* at p. 477, 86 S.Ct. at 1629. Because Scalf was not deprived of his freedom nor was he questioned in a coercive environment, the *Miranda* warnings were not required before his brief conversation with Officer Sanchez. *See also United States v. Miller,* 643 F.2d 713 (10th Cir.1981) (*Miranda* warnings not required prior to conversation in defendant's home when defendant was neither deprived of his freedom of action nor questioned in a coercive manner); *United States v. Bridwell,* 583 F.2d 1135 (10th Cir.1978) (*Miranda* warning not required where physician was questioned in his office, was not under arrest, and where there were no other indicia of coercion); *United States v. DiGiacomo,* 579 F.2d 1211 (10th Cir.1978) (*Miranda* warnings are required where agent's actions toward defendant in a parking lot were fundamentally equivalent to an arrest.)

## II.

Scalf contends that the district court erroneously instructed the jury that a person could use force in self-defense *to save his life or avert serious bodily harm.* Scalf argues that the right to use nonlethal force in self-defense is justified when a person reasonably apprehends *imminent danger of bodily harm.* Scalf predicates his argument regarding nonlethal force on the proposition that "In the present case, the 'victim' is alive; thus, self-defense by lethal force was not involved." We reject Scalf's tortured logic that because Spence survived the stabbings, self-defense by lethal force was not involved.

We hold that the district court properly instructed on self-defense. The court's instruction on self-defense was proper and most adequate particularly when, as here, Scalf was the aggressor; Scalf admitted chasing after Spence and stabbing him five or six times; Scalf acknowledged that Spence made no moves toward him at the time he stabbed Spence; and Scalf acknowledged that Spence had never touched him.

AFFIRMED.