UNITED STATES of America

v.

Samuel CADMUS, Defendant.

No. 85 Cr. 146 (SWK).

United States District Court,
S.D. New York.

July 25, 1985.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., by David E. Brodsky, New York City, for plaintiff.

Caesar D. Cirigliano, The Legal Aid Society, Federal Defender Services Unit by Leonard F. Joy, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

The above-captioned action is before the Court upon defendant's motion to suppress certain statements obtained from him by Immigration and Naturalization Service ("INS") detention officers. For the reasons stated below, the motion is granted.

### BACKGROUND

The defendant Samuel Cadmus is charged with one count of possession with intent to distribute heroin. On April 17, 1984, Cadmus filed this motion to suppress certain statements which were obtained prior to his arrest on these charges. On June 25, 1985, the Court held an evidentiary hearing on Cadmus' motion. From the testimony adduced at that hearing and the papers submitted on the motion, the Court finds that the facts set out below describe the relevant history of this case for this motion.

Cadmus is a Nigerian national. His primary language is Yoruban, but he speaks and understands a little English. On February 8, 1985, Cadmus was detained upon his arrival at John F. Kennedy International Airport when he presented a false passport. He was transported to the INS detention center at 201 Varick Street in Manhattan, where he was to be held pending deportation.

On February 15, 1985, after one week of detention, Cadmus had a visitor at the INS detention center. He met with this individual in the detention center's visiting area, which is set up to allow contact visits (Tr. 8–9, 30).* After the visit, Cadmus was strip-searched by Detention Officer Sigfredo Hernandez, in accordance with standard procedures prior to re-entry into the detention center population (Tr. 5). During the strip-search, Officer Hernandez found an item secreted in Cadmus' right sock. The item was approximately six inches in length, cylindrical, and was wrapped in brown paper with a tight, white tape on it (Tr. 5, 13).

Officer Hernandez knew that Cadmus was not permitted to possess such an item within the detention facility (Tr. 6). He asked Cadmus what the object was, to which Cadmus allegedly responded that it was a religious object (Tr. 5). Officer Hernandez also discovered $100 in Cadmus' possession, an amount in excess of that permitted to be carried by a detainee within the facility (Tr. 9–11). He brought Cadmus to see his supervisor, Officer Oppie Johnson, ostensibly to have the item and the

---

* References to the transcript of the June 25, 1985, evidentiary hearing are noted as "Tr." followed by the relevant page or pages.

money stored with Cadmus' personal property (Tr. 6).

Johnson's office is located approximately one-half city block (within the same building) from the search area (Tr. 29). Hernandez and Cadmus walked side-by-side down the hallway through three locked gates to get to Johnson's office (Tr. 17–19).

When Hernandez and Cadmus reached Johnson's office, Hernandez noticed that Cadmus no longer was carrying the cylindrical item (Tr. 6). Hernandez twice asked Cadmus what he had done with the cylindrical object (Tr. 7) or where it was (Tr. 35). Cadmus allegedly responded that he did not have it (Tr. 7) or that he did not know what Hernandez was talking about (Tr. 35). Thereafter, Johnson told Hernandez to go back over the route between the search area and his office to see if the item could be located. Hernandez did so, although it is unclear from the testimony whether Cadmus went with Hernandez (Tr. 36) or not (Tr. 7, 19).

While Hernandez was searching for the item, Johnson found it on the floor near his office (Tr. 26). Johnson verified with Hernandez that the item he found was the one that Hernandez had discovered in Cadmus' sock (Tr. 20, 39). Johnson asked Cadmus questions about the item. Johnson asked Cadmus what the object was; Cadmus allegedly responded that he did not know (Tr. 26, 39). Then Johnson asked Cadmus whether it was his; Cadmus allegedly responded that it was not (Tr. 26, 39). Then Johnson asked Cadmus whether he knew whose it was, and Cadmus allegedly responded first that it was his brother's, but then retracted that and said he did not know whose it was (Tr. 26, 39).

At some point thereafter Johnson discovered that the object had a strong odor of feces (Tr. 38, 39). Hernandez had not noticed the odor (Tr. 15).

Agents of the Drug Enforcement Administration ("DEA") were summoned to the detention center. They field tested the contents of the object, and determined that it contained a quantity of heroin. The DEA agents then arrested Cadmus and advised him of his *Miranda* rights. The DEA agents took Cadmus' statement wherein he apparently denied any knowledge of the object. These charges ensued.

The statement obtained by the DEA agents has not been challenged. Cadmus moves to suppress all statements obtained from him by Hernandez and Johnson, however, on the grounds that they were obtained in violation of his Fifth Amendment rights.

## DISCUSSION

■ The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." Generally, this privilege is not self-executing: an individual must claim the privilege against self-incrimination in response to specific questions if he desires the protection of the privilege. *See, e.g., Roberts v. United States,* 445 U.S. 552, 559, 100 S.Ct. 1358, 1363, 63 L.Ed.2d 622 (1980); *United States v. Monia,* 317 U.S. 424, 427, 63 S.Ct. 409, 410, 87 L.Ed. 376 (1943). There are, however, limited exceptions to this general rule.

One well-known exception to this rule involves statements obtained during custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As the Court stated in *Miranda,* "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." 384 U.S. at 478, 86 S.Ct. at 1630. *Miranda* requires that before any questions can be posed to an individual in custody the individual must be advised of certain rights (now known as *Miranda* rights).

There is no dispute that Officers Hernandez and Johnson did not advise Cadmus of his *Miranda* rights. Defendant argues, therefore, that since he was in custody at the time, his statements must be suppressed. The Government argues that Cadmus was not "in custody" within the import of *Miranda.*

■ The Court in *Miranda* held that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody *or otherwise deprived of his freedom of action in any significant way.*" 384 U.S. at 444, 86 S.Ct. at 1612 (footnote omitted) (emphasis added). Accordingly, the custody element of *Miranda* is found where there are significant restrictions on the individual's freedom of action, or on the individual's freedom to depart. *See Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). As the Court recently stated, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (*quoting Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714).

Cadmus was detained at the INS detention center, a facility similar, if not identical, to a prison. *Cf. Rodriguez-Fernandez v. Wilkinson,* 654 F.2d 1382, 1387 (10th Cir.1981) ("[d]etention pending deportation ... properly analogized to incarceration pending trial or other disposition of criminal charge"). Clearly, he was not free to leave the facility. He was not even free to move around the facility without the companionship of a detention officer (Tr. 19). This would appear to satisfy the requirements of *Miranda.*

Such a strict application of a "freedom to leave" or "freedom of movement" standard would lead to a *per se* rule regarding the questioning of an individual in a prison setting. Relying on *United States v. Scalf,* 725 F.2d 1272 (10th Cir.1984), and *Cervantes v. Walker,* 589 F.2d 424 (9th Cir.1978), the Government argues that, in such a setting, some additional restraint on the defendant's liberty must be present to require the *Miranda* warnings.

The court in *Cervantes* rejected a *per se* rule that any investigatory questioning inside a prison requires *Miranda* warnings. 589 F.2d at 427. In determining that the questioning involved had not occurred while the defendant was in custody, the court in *Cervantes* held that an "added imposition on [the inmate's] freedom of movement" is necessary to constitute "custody" within the principles of *Miranda. Id.* at 428. *See also Scalf,* 725 F.2d 1272 (adopting reasoning of *Cervantes* ). Moreover, the courts analogized the interrogations involved to on-the-scene questioning. *Scalf,* 725 F.2d at 1276; *Cervantes,* 589 F.2d at 429. Recognizing that the Court in *Miranda* had explained that "[g]eneral on-the-scene questioning as to facts surrounding a crime ... is not affected by our holding," 384 U.S. at 477, 86 S.Ct. at 1629, the courts in *Cervantes* and *Scalf* held that *Miranda* warnings were not required. This Court, however, does not find the reasoning of these cases persuasive.

In *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), the Court held that *Miranda* warnings were required before questions could be put to a prisoner regarding possible criminal tax violations. The government had attempted to distinguish the application of *Miranda* in the prison setting by urging that the "custody" the inmate faced at the time of the questioning had arisen from another crime. The Court made short shrift of that argument, stating "[t]hese differences are too minor and shadowy to justify a departure from the well-considered conclusions of *Miranda* with reference to warnings to be given to a person *held in custody.*" 391 U.S. at 4, 88 S.Ct. at 1504 (emphasis added). In its decision, the Court perforce held that the inmate there was in custody within the meaning of *Miranda,* and therefore determined that his statements, obtained without a *Miranda* warning, had to be suppressed.

*Mathis* makes it clear that an individual imprisoned, irrespective of the reason for his incarceration, is in custody. *See also Blyden v. Hogan,* 320 F.Supp. 513 (S.D.N.Y.1970); *cf. United States v. Henry,* 447 U.S. 264, 273–74, 100 S.Ct. 2183, 2188–89, 65 L.Ed.2d 115 (1980) (incarcerated defendant is "in custody" for purposes of Sixth Amendment; citing *Miranda* with approv-

al). In *Blyden*, several inmates from the Manhattan House of Detention argued, among other things, that any interrogation of them concerning recent prison riots without the recitation of *Miranda* warnings violated their constitutional rights. Judge Lasker agreed, holding that the inmates "are clearly in custody within the rule of *Mathis*." 320 F.Supp. at 519.

Moreover, the analogy urged by the Government, and drawn by the courts in *Scalf* and *Cervantes*, to on-the-scene questioning is unpersuasive. Persons temporarily detained for on-the-scene questioning simply are not in custody at all. *Berkemer v. McCarty*, — U.S. —, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984). Individuals stopped for such questioning are generally detained briefly and temporarily. They can reasonably expect *soon* to "be allowed to continue on [their] way." *Id.*, 104 S.Ct. at 3149. Additionally, the detention is generally public, in the open for anyone to see—allaying some fears and suspicions about the interrogator. *Id.* at 3150. Neither of these mitigating circumstances is present in a prison interrogation—even one concerning prison crime conducted immediately after its discovery. On-the-scene questioning also rarely, if ever, involves a strip-search. Certainly, being disrobed places more restrictions on the individual's freedom of movement. Furthermore, the Court in *Berkemer* specifically distinguished the circumstances of ordinary traffic stops—classic on-the-scene investigation—from the custodial atmosphere surrounding interrogation of an individual while he is in jail. *Id.* at 3150, 3150 n. 28.

This Court feels that a stronger, though still imperfect, analogy can be drawn to customs, or immigration, searches and interrogations. Customs and immigration searches are generally brief, like on-the-scene questioning, and accompanied by the reasonable expectation that the individual will soon be free to go where he pleases. They are, however, often conducted in personal search rooms, and sometimes entail invasive, detaining stripsearches. Nonetheless, in such situations, brief detention for a search with concomitant routine questioning is entirely appropriate, and does not require the application of *Miranda*. *See United States v. Espericueta-Reyes*, 631 F.2d 616, 622 (9th Cir.1980); *United States v. Golden*, 532 F.2d 1244, 1246 (9th Cir.), *cert. denied sub nom. Trowery v. United States*, 429 U.S. 842, 97 S.Ct. 118, 50 L.Ed.2d 111 (1976). In those situations, however, once the answers to the questions, or the results of a search, provide the official with probable cause to arrest the detainee, *Miranda* generally is applicable. *See Espericueta-Reyes*, 631 F.2d at 622; *see also United States v. Estrada-Lucas*, 651 F.2d 1261, 1265–66 (9th Cir.1980) (finding detainee to be in custody on facts of case); *United States v. Berard*, 281 F.Supp. 328 (D.Mass.1968).

The facts and holding of the *Berard* case are particularly instructive. There an alien was detained upon arrival at Logan International Airport in Boston for a customs inspection. During the course of the detention, the alien was taken to a personal search room and partially strip-searched. When the alien removed his shirt, he revealed a torso taped, from waist to armpit, with white tape holding plastic bags containing white powder. 281 F.Supp. at 332. The alien was then asked, without *Miranda* warnings, what was contained in the plastic bags. He responded, "heroin." The court held that at the point where the detainee had partially disrobed and the material taped to his person had been discovered, he was no longer free to leave and was in custody within the meaning of *Miranda*. 281 F.Supp. at 335. Accordingly, the detainee's admission that the material was heroin was suppressed.

■ The strip-searching of a prison inmate is even more custodial than the searching of an individual in a customs or immigration context. The inmate has no expectation that he will soon be free to leave, or, for that matter, that he can soon "escape" the interrogator's reach. For the reasons discussed above, this Court finds that prison interrogation, whether by an investigator concerning prior potentially

criminal conduct, or by a prison guard regarding prison crime immediately after its discovery, is custodial within the meaning of *Miranda.*

A rule that persons in prison are in custody and must be advised of their rights prior to questioning is fully consistent with the logic underlying *Miranda* and *Mathis.* *Miranda* established a prophylactic rule intended to ensure that suspects are not coerced into confessing. *See Berkemer,* 104 S.Ct. at 3147; *see also Henry,* 447 U.S. at 273–74, 100 S.Ct. at 2188. The rule was designed for situations believed to be intrinsically coercive and susceptible of abuse. *See Miranda,* 384 U.S. at 467, 86 S.Ct. at 1624 ("inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely"); *see also Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 1144, 79 L.Ed.2d 409 (1984). Prison is certainly a "police dominated" surrounding that is inherently coercive. *See Berkemer,* 104 S.Ct. at 3150, 3150 n. 28. *Miranda* recognized the powerful psychological effect on a person confined, alone with his interrogator, which often induces the individual to reach for aid. 384 U.S. at 448–55, 86 S.Ct. at 1614–17. This powerful influence is certainly present when the individual is confined in prison. *See Henry,* 447 U.S. at 273–74, 100 S.Ct. at 2188. Furthermore, the coercion inherent in custodial interrogation derives in large part from the knowledge of the accused that he cannot escape his interrogator, and that the questioning can continue until the desired answer is obtained. *See Miranda,* 384 U.S. at 468, 86 S.Ct. at 1624; *see also Murphy,* 104 S.Ct. at 1145–46. In *Murphy,* the Court discussed the situation where "a suspect ... is painfully aware that he literally cannot escape a persistent custodial interrogator." 104 S.Ct. at 1146. It would be hard to conceive of a situation where the accused was less able to escape his interrogator than in a prison setting. *Compare Berkemer,* 104 S.Ct. at 3149–50 (motorist stopped for traffic stop reasonably expects to be free to continue on his way in short

order). Indeed, in this case, Cadmus had already spent seven days in detention. There was no way for him to know when he might at least be able to return to his home.

▪ Justice White, dissenting in *Mathis,* urged that

Miranda rested not on the mere fact of physical restriction but on a conclusion that coercion—pressure to answer questions—usually flows from a certain type of custody, police station interrogation of someone charged with or suspected of a crime. Although petitioner was confined, he was at the time of interrogation in familiar surroundings.... The rationale of *Miranda* has no relevance to inquiries conducted outside the allegedly hostile and forbidding atmosphere surrounding police station interrogation of a criminal suspect.

391 U.S. at 7–8, 88 S.Ct. at 1506. This reasoning, apparently consonant with the decisions in *Cervantes* and *Scalf,* was squarely rejected by the majority in *Mathis.* The prison setting is an inherently coercive one. An individual incarcerated, or detained in a prison-like facility, is in custody.

The Court in *Miranda* also wanted to obviate the need for case-by-case analysis of the voluntariness of the suspect's confession, or of the coerciveness of the particular circumstances surrounding that confession. *See Berkemer,* 104 S.Ct. at 3147. Application of the principles enunciated in *Cervantes* and *Scalf,* as the Government urges, would reintroduce, in the prison setting, the case-by-case analysis of coerciveness that *Miranda* was intended to avoid.

Finally, *Miranda* established a clear rule, specifically instructing law enforcement officials as to what they must do in custodial interrogations. *See Berkemer,* 104 S.Ct. at 3145–46; *Fare v. Michael C.,* 442 U.S. 707, 718, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979). The test the Government would apply to the question of whether interrogation in prison is custodial in nature is elusive. Where bright-line dis-

tinctions can be drawn, consistent with the principles enunciated in *Miranda,* they should be, lest we undermine the clarity of *Miranda,* one of its "crucial advantages." *Berkemer,* 104 S.Ct. at 3146.

In sum, this Court believes that a fair reading of *Miranda* and *Mathis* leads ineluctably to the conclusion that custody is custody—an individual incarcerated, or detained in a prison-like facility, is in custody and must be advised of his *Miranda* rights before any interrogation can take place. Even were this Court to hold otherwise, the statements in this case would still have to be suppressed.

In the case at bar, even without the application of a *per se* rule, the Court would hold that Cadmus' interrogation was custodial. It is clear that at the point that Hernandez discovered the cylindrical item in Cadmus' sock, there was probable cause to believe that Cadmus had committed a crime. Defendant points out that it is a federal crime to possess, within a facility such as the INS detention center, any object or currency in violation of the regulations of that institution. 18 U.S.C. § 1791. Officer Hernandez knew, at the time he began questioning Cadmus, that there had been a likely violation of the law (Tr. 14). Moreover, the nature of the item found—a six-inch cylindrical container, wrapped in brown paper, taped tightly shut with white tape, and smelling of feces (although it is unclear whether Hernandez noticed this last factor)—was so suspicious that surely Cadmus would not have been permitted to simply return to his already restricted environment until further investigation was completed. The surroundings and circumstances of the interrogation were coercive. Cadmus was questioned first in a small, private room, away from the general population. Cadmus had been forced to disrobe. After the questions asked by Hernandez apparently did not occasion a suitable response, Cadmus was taken to Hernandez' supervisor. There again he was confronted with the evidence against him. Finally, Cadmus was only slightly conversant with the language, and probably was not famil-

iar at all with the law, of this country. *See United States v. Prestigiacomo,* 504 F.Supp. 681, 683 (E.D.N.Y.1981). In such circumstances, Cadmus was restrained to a "degree associated with a formal arrest."

Since Cadmus was in custody at the time he was interrogated and at the time the statements that are the subject of this motion were obtained, the INS officers were required to advise him of his *Miranda* rights before questioning him. They did not do so. Accordingly; defendant's motion must perforce be GRANTED. The statements obtained from him prior to his arrest on the instant charges are hereby SUPPRESSED.

SO ORDERED.