No. 89–5346.   BRADLEY v. OHIO.   Sup. Ct. Ohio.   Certiorari denied.

JUSTICE BRENNAN, dissenting.

Adhering to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia*, 428 U. S. 153, 227 (1976), I would grant certiorari and vacate the death sentence in this case.

JUSTICE MARSHALL, dissenting.

In *Miranda* v. *Arizona*, 384 U. S. 436 (1966), this Court held that "the prosecution may not use statements, whether exculpa-

tory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.,* at 444. Consistent with the need for a bright-line rule, the Court adopted a straightforward definition of "custodial interrogation": "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Ibid.* In this case, petitioner, a prison inmate, challenged the admission of statements he made in response to direct questioning by prison officials following the murder of a prison employee on the ground that they had not given him the *Miranda* warnings. Notwithstanding *Miranda's* clear language, the State Court of Appeals held that petitioner was not in custody for purposes of *Miranda,* see No. 1583 (Sept. 22, 1987), App. to Pet. for Cert. A-129–A-130, and the Ohio Supreme Court affirmed this point without discussion, 42 Ohio St. 3d 136, 148, 538 N. E. 2d 373, 385 (1989). Because the Courts of Appeals have approached the issue of what constitutes custody in the prison setting in differing ways,* this Court should grant the petition for certiorari to state clearly when *Miranda* applies in this context.

On February 2, 1984, the supervisor of the Southern Ohio Correctional Facility's sheet metal shop was beaten to death. Immediately after the murder, prison officials closed off the shop area and began to conduct a strip search of the inmates there. During the search, the officials found blood on one inmate's clothing. When he was asked for an explanation, another inmate, petitioner William Bradley, told the officials that the first prisoner "had nothing to do with this." 42 Ohio St. 3d, at 138, 538 N. E. 2d, at 376. The officials then searched petitioner and found blood on his clothing. The state court described the questioning that ensued:

---

*See *United States* v. *Cooper,* 800 F. 2d 412, 414–415 (CA4 1986) (holding that prison inmate was not in custody for *Miranda* purposes because his freedom of movement was not restricted more than it would normally be in the prison environment); *Flittie* v. *Solem,* 751 F. 2d 967, 974 (CA8 1985) ("Incarceration does not ipso facto make a statement involuntary"); *Cervantes* v. *Walker,* 589 F. 2d 424, 427–429 (CA9 1978) (refusing to apply *Miranda* to questioning of a prison inmate that the court characterized as "on-the-scene questioning" and holding that prison inmate's freedom of movement was not diminished more than usual in the prison context); *United States* v. *Scalf,* 725 F. 2d 1272, 1276 (CA10 1984) (same).

> "Corrections Officer Richard Taylor . . . asked for an explanation.  [Petitioner] pointed to where [the] body had been and stated that it was the foreman's blood.  Officer Taylor called the spot to the attention of Deputy Superintendent Seth, who repeated the questions to [petitioner] and received the same answers.  Officer Taylor then asked [petitioner], '[D]id you do it?'  [Petitioner] replied, '[Y]eah, I did it.'"  *Ibid.*

Although petitioner was not apprised of his *Miranda* rights before this questioning, the trial court denied his motion to suppress the incriminating responses.  Petitioner was convicted of aggravated murder and sentenced to death.  On this direct appeal, the State Court of Appeals found that "the detention of [petitioner] and other inmates here was similar to those restrictions imposed with every incident that would take place at the prison, [so] it did not necessarily place an added imposition on his freedom of movement such as to make a reasonable person believe there had been a restriction of his freedom over and above that in his normal prisoner setting."  App. to Pet. for Cert. A-130.  Thus, although it acknowledged that petitioner had been interrogated, the court found that petitioner had not been in custody, as defined by *Miranda*.  The court therefore held that *Miranda* warnings were not required.  The Supreme Court affirmed the conviction.  42 Ohio St. 3d, at 148, 538 N. E. 2d, at 385.

To determine whether a person is in custody for purposes of *Miranda*, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  *California* v. *Beheler*, 463 U. S. 1121, 1125 (1983) *(per curiam)* (quoting *Oregon* v. *Mathiason*, 429 U. S. 492, 495 (1977)).  This Court recently left open the question whether "[t]he bare fact of custody [would] in every instance require a warning even when the suspect is aware that he is speaking to an official."  *Illinois* v. *Perkins*, 496 U. S. 292, 299 (1990).  In my view, *Miranda* and its progeny have already answered that question.  In this case, petitioner was clearly in custody because he had been formally arrested.  Moreover, his incarceration resulted in a severe restraint on his freedom of movement.  That his incarceration was the result of a conviction for a crime unrelated to the murder of the prison employee is irrelevant.  See *Mathis* v. *United States*, 391 U. S. 1, 4–5 (1968) (holding that a person serving a prison sentence for one crime was in custody

when he was interrogated about another, unrelated crime). His familiarity with the prison environment is also irrelevant to the *Miranda* analysis. See *Orozco* v. *Texas*, 394 U. S. 324, 326–327 (1969) (holding that suspect who had been arrested in his home and questioned in his bedroom was in custody, notwithstanding his familiarity with his surroundings).

The state courts here, like some Courts of Appeals, see note, *supra*, nevertheless maintained that a prison inmate is in custody for purposes of *Miranda* only if some additional restriction on his freedom of movement is imposed. See App. to Pet. for Cert. A-129. Even if this "additional restriction" test were consistent with *Miranda*, petitioner satisfies it: His freedom was curtailed more severely than was usual even in the controlled environment of prison—he was detained in the sheet metal shop, targeted as a suspect in a serious crime, and forcibly strip-searched.

The second requirement for the application of *Miranda*—interrogation—is also present in this case. Prison officials asked petitioner a series of direct questions about a murder in which he was a suspect. Contrary to the State's assertion, Brief in Opposition 10–11, these questions cannot accurately be characterized as "on-the-scene questioning" exempt from the *Miranda* requirements. The *Miranda* Court stated that

> "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." 384 U. S., at 477–478.

Here, though, prison officials had been summoned by a witness to the incident, had seen both the body and the weapon, and had detained those persons who could be responsible for the murder. The questioning of petitioner, directed at discovering whether he had committed the crime, thus went well beyond "on-the-scene questioning." Indeed, the State Court of Appeals acknowledged that this questioning constituted interrogation. App. to Pet. for Cert. A-128.

Under this Court's recent decision in *Perkins*, *supra*, petitioner may also have to establish that his statements were "coerced."

496 U. S., at 299. The type of coercive environment described by the Court in *Perkins* was present in this case. First, the questioning occurred in prison, undoubtedly a "'police-dominated atmosphere.'" *Id.*, at 296. And when the guards rounded up the inmates and strip-searched them, the sense of police domination was increased. Second, the prison officials were openly acting as agents of the State, and petitioner knew that they were responsible for determining the extent of his freedom. See *id.*, at 297 ("Questioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the Court has assumed will weaken the suspect's will"). Given the virtually complete control that prison officials exercise over prisoners' lives, petitioner surely felt compelled to answer questions "by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess." *Ibid.*

Thus, petitioner was in custody, was interrogated by prison officials, and was subjected to police coercion. Because the guards did not inform him of his *Miranda* rights before interrogating him, his responses to their direct questioning could not be used against him at trial. This case represents more than an opportunity to correct an erroneous decision, however; it provides the Court a chance to clarify what constitutes "custody" for *Miranda* purposes in the prison setting. I would therefore grant the petition for certiorari. Even if I did not believe that this case otherwise merited review, I would grant the petition and vacate petitioner's death sentence on the ground that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments. *Gregg* v. *Georgia*, 428 U. S. 153, 231 (1976) (MARSHALL, J., dissenting).