The STATE of Ohio, Appellee,

v.

GRIFFIN, Appellant.

[Cite as *State v. Griffin* (1992), 73 Ohio App.3d 546.]

Court of Appeals of Ohio,
Coshocton County.

No. 90–CA–2.

Decided Feb. 12, 1992.

*William M. Owens,* Prosecuting Attorney, for appellee.

*Tataru, Wallace & Wallace* and *Roger Warner,* for appellant.

MILLIGAN, Judge.

Following a bench trial in the Coshocton County Court of Common Pleas, appellant Sandra Maxwell Griffin was convicted of complicity (R.C. 2923.03) in the commission of the following offenses: (1) aggravated murder with an aggravated robbery specification and a firearm specification (R.C. 2903.01[A], 2929.04[A][7], 2929.71); (2) unlawful possession of a dangerous ordnance (R.C. 2923.17); (3) grand theft (R.C. 2913.02[A][1]); (4) aggravated robbery with a firearm specification (R.C. 2911.01).

Griffin was sentenced to life imprisonment with parole eligibility in thirty years for the aggravated murder, and three years' actual incarceration on the firearm specification to be served consecutively. She was sentenced to ten to twenty-five years' for the aggravated robbery, to be served concurrently. She was sentenced to three years for the firearm specification on the aggravated robbery, to be served only if the firearm specification on the aggravated murder was negated.

James Steurer, Sr., the victim, grew marijuana on his farm in Coshocton County. In 1987, he met Griffin.

Griffin, who was from Cleveland, Tennessee, was sexually involved with Carl Steven Lewis (see *State v. Lewis* [Feb. 13, 1991], Coshocton App. No. 90–CA–3, unreported, 1991 WL 21491). Lewis and Griffin both used marijuana. In addition, Griffin took cocaine, Xanax and Valium.

In 1988, Griffin also became sexually involved with James Steurer, Sr. ("James, Sr."). Griffin would come to Coshocton or James, Sr. would travel to Cleveland. James, Sr. gave Griffin money and marijuana. She referred to him as her "sugar daddy."

During this time, Griffin was still involved with Lewis. In Tennessee, Lewis sold marijuana grown on the Coshocton farm.

In June 1988, James Steurer, II, moved to the Coshocton farm to live with his father, James, Sr. He became involved in the marijuana operation, keeping machinery operating. James, II, hated his father. While staying at the farm, James, II, met Griffin. He became friends with Griffin and Lewis, eventually moving to Tennessee to live with them.

Griffin's relationship with James, Sr. soured in 1988. James, Sr. was angry with Griffin over her drug use, and hit her several times. Griffin stated that she would kill James, Sr. for hitting her. In November and December 1988, Griffin, James, II, and Lewis began plotting to kill James, Sr. and also to steal his collection of firearms.

On January 3, 1989, the threesome began their drive from Cleveland to Coshocton, further planning the murder along the way. They arrived at the Steurer farm in the early morning hours of January 4. They went to sleep after they arrived: James, II, on the couch, Lewis in a bedroom and Griffin in James, Sr.'s bed.

The next morning, while James, Sr. was in the barn feeding his animals, Lewis and James, II, prepared to kill him. They went to the barn, where James, II, spoke to his father. When James, Sr. began to walk to the house, James, II, and Lewis followed behind. Lewis shot James, Sr. in the head, killing him.

Lewis and James, II, returned to the house. Griffin was standing in the kitchen. Griffin asked if it was done, to which Lewis replied, "yes." Lewis handed the gun to Griffin.

James, II, went upstairs, where Griffin had already started packing. Pistols were lying on the bed. Griffin said that she had taken all the money from James, Sr.'s wallet, except for $3. They went through James, Sr.'s desk and took approximately $500 and more guns.

James, II, and Lewis went outside. They placed James, Sr.'s body on a tractor, obtained diesel fuel and gunpowder and then took James, Sr.'s body into the woods. Lewis put kindling on top of the body and then lit a fire. After James, II, and Lewis had burned James, Sr.'s body, they placed hay on top of it and returned to the house.

The two men helped Griffin load weapons into the car. They all drove back to Tennessee. They buried some of the weapons and sold others. Griffin called back to the farm and left a message on the answering machine for James, Sr.

The day after the killing, several hunters came upon the burned area in the woods. They saw a rib cage which was still smoldering. The hunters assumed the rib cage was from a pig. Later in January, the Coshocton County Sheriff was notified of the disappearance of James, Sr. At the burn site, the sheriff's department recovered James, Sr.'s skull, which showed signs of injury by a blunt instrument. The sheriff's department also found a vertebrae, part of James, Sr.'s left arm and left leg, teeth and buttons. Steel toes from a pair of shoes were found pointed up, as if a body had been lying at the site. James, Sr.'s body was identified through dental records.

Griffin appeals the judgment of the court, assigning five errors:

### Assignment of Error No. I

"The trial court denied the appellant her right to due process and the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments of the United States Constitution and §§ Ten and Sixteen, Article One of the Ohio Constitution."

### Assignment of Error No. II

"The trial court erred in not granting appellant's motion for a state's witness, James Owens Steurer, Jr., to submit to a psychological and neurological test as well as a polygraph examination for purpose of determining the witness' competency to stand trial in violation of her right to a fir [sic] trial as guaranteed by both the Ohio and United States Constitutions."

### Assignment of Error No. III

"The trial court erred in allowing both a witness and his counsel to assert attorney-client privilege when the witness has waived repeatedly that privilege thereby denying the appellant the right to effective assistance of counsel, to confront witnesses, and ability to have a fair trial under both the Ohio and United States Constitutions."

### Assignment of Error No. IV

"The trial court erred in not compelling James Owen Steurer, II, to testify at a pretrial motion when he had previously entered a guilty plea to murder and other crimes and therefore had no right to protection under the Fifth Amendment, the answers were not self-incriminating, and he had waived any privileges that may have existed."

### Assignment of Error No. V

"The trial court erred in the sentencing of the appellant by not following the mandates of R.C. 2929.03 and 2929.04, as well as allowing victim impact evidence in violation of Evid.R. 404, the Fifth, Eighth, and Fourteenth Amend-

ments to the United States Constitution and Article I, §§ Nine, Ten, and Sixteen of the Ohio Constitution."

## I

 Appellant Griffin argues that the court erred in failing to give her a hearing regarding an alleged violation of her Sixth Amendment right to counsel.

At the June 28, 1990 hearing on appellant's motion for a new trial, James, II, revealed that he had listened in on appellant's phone conversations while both were incarcerated at the Coshocton County Jail. By pressing zero on the phone, inmates could listen in on other inmates' conversations.

Appellant had the opportunity at the June 28 hearing to extensively question James, II, concerning what he had heard and to whom he had reported such conversations. The trial court asked appellant to submit a memorandum if she wished to request a second hearing.

On October 26, 1990, appellant filed pleadings concerning the conversations. On December 19, 1990, the court responded, stating that if appellant desired a further hearing she should file a memorandum stating what could be accomplished by such a hearing. On January 8, 1991, appellant indicated that at a further hearing, she would call as witnesses all of the deputies who worked at the jail from February through December 1989.

The memorandum did not indicate that appellant intended to further question James, II, or that she wanted to question the prosecutor as to whether any information was passed on and used against her. The court did not abuse its discretion in determining that the type of hearing requested by appellant would be nothing more than a "fishing expedition."

Based on the testimony at the new trial hearing, the court did not err in determining that no constitutional violation occurred when James, II, overheard appellant's conversations. James, II, testified that he did not hear Griffin's conversations with her defense team, and she did not talk about anything important.

The first assignment of error is overruled.

## II

 Appellant moved to require James, II, to submit to psychological, neurological, and polygraph testing to determine his competency to testify at

trial. The court overruled the motion, determining that appellant could inquire as to competency if James, II, testified at trial.

At the August 21, 1989 motion hearing, James, II, refused to answer questions on the advice of counsel. Lieutenant Mosier of the Coshocton County Sheriff's Department had taken statements from James, II, and testified that James, II, could tell the truth when he chose to.

The trial court is in the best position to determine the competency of a witness to testify, and is given wide discretion in determining competency. *State v. Bradley* (1989), 42 Ohio St.3d 136, 141, 538 N.E.2d 373, 379, certiorari denied (1990), 497 U.S. ——, 110 S.Ct. 3258, 111 L.Ed.2d 768. Having been vested with wide discretion to determine competency, the court also has discretion to determine whether testing is required to make the competency determination. See *id.* (no abuse of discretion in determining competency before arrival of records regarding incompetency of witness). Appellant did not renew her request for testing when James, II, testified at trial.

The second assignment of error is overruled.

## III

At the time of the August 21 hearing, James, II, had entered a plea of guilty of murder, but had not yet been sentenced. On the advice of counsel, he refused to answer questions.

Appellant argues that James, II, had waived his attorney-client privilege by disclosing information of child abuse to law enforcement officials and by moving for neurological testing in the state's case against him.

The fact that he requested testing in his own case does not waive the attorney-client privilege as to the underlying bases for that motion. Appellant was given the opportunity to question Lieutenant Mosier as to what James, II, told him regarding child abuse. The trial court informed appellant that if James, II, took the stand at trial, she could inquire further regarding competency. This she chose not to do. The court did not err in allowing James, II, to claim privilege at the initial hearing.

## IV

At the time of the hearing, James, II, had entered his plea but had not yet been sentenced. The court did not err in allowing James, II, to assert his Fifth Amendment privilege against self-incrimination, as the plea bargaining

process was not yet complete. Appellant could have inquired as to competency when James took the stand at trial, but chose not to do so.

The fourth assignment of error is overruled.

## V

Appellant claims error by the trial court in two dimensions: first, that the procedure for sentencing in death penalty cases was not followed, and, second, that victim impact evidence was admitted at the sentencing hearing contrary to law (Evid.R. 404) and in contravention of federal and state constitutional provisions.

At the sentencing hearing, the court allowed each of the victim's two daughters to make a statement.

Marilyn Steurer concurred with appellant's psychologist's testimony that twenty-three years of incarceration was an appropriate sentence.

Janice Taylor spoke about the effect losing her father had on her family. She stated that after twenty-three years of incarceration, appellant would be of no more benefit to society than she had been in her first twenty-six years of life. She stated that appellant had been under psychiatric care in the past to no avail, and that twenty-three years of incarceration at the taxpayers' expense would not be of any additional benefit. She stated that appellant had shown no remorse for what she had done, and the maximum penalty allowable by law would be a fair and just punishment.

Before pronouncing sentence, the judge stated that he had considered the statements of the victim's daughters. He then first sentenced appellant as to aggravated robbery.

Without further comment, he sentenced her to aggravated murder.

We overrule each branch of the assigned error for several reasons.

■ First, although this is a "capital offense," it is no longer a case within the ambit of the sentencing provisions of R.C. 2929.03 *et seq.* By pretrial agreement the appellant waived her right to jury trial in return for the agreement of the state not to request the death penalty. The case was tried to a single judge, sitting without a jury. At minimum the death penalty option was extinguished the moment appellant was placed in jeopardy in the trial.[1]

---

1. The only way a defendant may be held to the death penalty is if he or she is tried to a jury or a three-judge panel. R.C. 2945.06.

■ Second, while the judge in the case *sub judice* states that he considered the evidence, he does not state that he considered it as to the sentence for aggravated murder. Appellant was also sentenced for aggravated robbery, for which the judge was *required* to allow the victim's family members to make a statement if they so desired. R.C. 2945.07. Furthermore, before sentencing a defendant for a felony, the court is to consider victim impact evidence. R.C. 2947.051 and 2929.12. We presume that the judge knew the law (particularly as appellant pointed out that *Booth v. Maryland*, [1987], 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440, prohibited such evidence from being admitted at a capital sentencing hearing), and he considered the victim's daughters' statements only as to the sentence for aggravated robbery. See *State v. Post* (1987), 32 Ohio St.3d 380, 513 N.E.2d 754, certiorari denied (1988), 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023.

Third, although R.C. 2945.07 requires a victim impact statement in most felony convictions, it does not prohibit such statement in a capital offense where the death penalty is not sought.[2]

Finally, Evid.R. 404 does not apply to sentencing hearings. Evid.R. 101(C)(3), Staff Note.

The fifth assignment of error is overruled, and the judgment of the Coshocton County Common Pleas Court is affirmed.

*Judgment affirmed.*

PUTMAN, P.J., and SMART, J., concur.

■

---

**2.** The convoluted history of the United States Supreme Court's consideration of the issue of victim impact-death penalty, and its impact upon Ohio law, is irrelevant here because this is not a death case.