DECISION AND JOURNAL ENTRY
{¶ 1} Defendant-Appellant Delawrence King has appealed from his convictions in the Lorain County Court of Common Pleas of murder and felonious assault, with gun specifications. This Court affirms.
 I {¶ 2} On November 5, 2003, Appellant was indicted on two counts of aggravated murder, in violation of R.C. 2903.01(A), with three year gun specifications; two counts of murder, in violation of R.C. 2903.02(B), with three year gun specifications; two counts of felonious assault, in violation of R.C.2903.11(A)(1), with three year gun specifications; and one count of improperly discharging a firearm at/into a habitation, in violation of R.C. 2923.161, with a three year gun specification. Appellant entered pleas of "not guilty" to all charges.
 {¶ 3} A jury trial commenced on September 20, 2004. After the State rested its case, Appellant made a Crim.R. 29 motion, which the trial court denied on all counts except count two, the second aggravated murder count with a three year gun specification. On September 23, 2004, the jury returned its verdict and found Appellant guilty of both murder counts with the gun specifications and one count of felonious assault with the gun specification.
 {¶ 4} Appellant has timely appealed his convictions, asserting four assignments of error. For ease of analysis, Appellant's first and second assignments of error have been consolidated.
 II Assignment of Error Number One
"APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]"
 Assignment of Error Number Two
"THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29 OF THE OHIO RULES OF CRIMINAL PROCEDURE[.]"
 {¶ 5} In his first and second assignments of error, Appellant has argued that his convictions were against the manifest weight of the evidence and based upon insufficient evidence. Specifically, Appellant has argued that the State failed to demonstrate that he purposely killed the victims. Appellant has also asserted that he proved his claim of self defense. We disagree.
 {¶ 6} A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at 3. "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." Id., citingState v. Thompkins (1997), 78 Ohio St.3d 380, 390 (Cook, J., concurring). In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. State v. Jenks (1991), 61 Ohio St.3d 259, 279. Furthermore:
"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id, at paragraph two of the syllabus; see, also,Thompkins, 78 Ohio St.3d at 386.
 {¶ 7} In State v. Roberts, this Court explained:
"[S]ufficiency is required to take a case to the jury. * * * Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at 4. (Emphasis omitted).
 {¶ 8} In determining whether a conviction is against the manifest weight of the evidence an appellate court:
"[M]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339,340.
 {¶ 9} A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. Thompkins, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id. at 388. An appellate court must make every reasonable presumption in favor of the judgment and findings of fact of the trial court.Karches v. Cincinnati (1988), 38 Ohio St.3d 12, 19. Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175; see, also, Otten,33 Ohio App.3d at 340.
 {¶ 10} Appellant was convicted of two counts of murder in violation of R.C. 2903.02(B) and one count of felonious assault in violation of R.C. 2903.11(A)(1). Pursuant to R.C. 2903.02(B), "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]" R.C. 2903.11(A)(1) prohibits one from "knowingly * * * [c]aus[ing] serious physical harm to another[.]"
 {¶ 11} During the trial, the State presented testimony from several witnesses and Appellant testified on his own behalf. It was undisputed that on October 26, 2003, Appellant fired several gunshots that resulted in the deaths of two men. At issue were the events leading up to the shootings.
 {¶ 12} Charles A. Mason ("Mason") testified to the following for the State. In the early evening of October 26, 2003, Mason was moving out of the Wilkes Villa housing complex when he heard his fiancé arguing with someone. Mason discovered Appellant attempting to remove the rear exterior light of Mason's apartment. Appellant then "pulled a pistol" on Mason; Appellant eventually settled down, put the gun away, and left. Later, Mason and his fiancé encountered Appellant again and Appellant accused Mason of owing him money and asked Mason if he had called the police. When Appellant was convinced that Mason had not called the police he left. Mason and his fiancé began to walk towards their car and Mason heard gunshots coming from the vicinity of Appellant. Mason identified a red coat with fur as being Appellant's coat, but stated that Appellant was not wearing it when he saw him that evening.
 {¶ 13} On cross-examination Mason denied buying drugs from Appellant.
 {¶ 14} Darrine T. Miles ("Miles") testified to the following for the State. Miles also lived in Wilkes Villa, was friends with Appellant, and saw Appellant on October 26, 2003. Miles and Appellant drank beer and talked during the day and met up again that evening. That evening Appellant told Miles that he had fired a gun earlier in the day and attempted to take a light bulb. Miles and Appellant went to Appellant's sister's house for an hour to an hour and a half and then, at Appellant's direction, they left and walked to Tedman Court, another area in Wilkes Villa. Miles knew that Appellant had his gun in his waistband. Appellant told Miles they were going to get gas money, but Miles had no idea where they were going to get it from.
 {¶ 15} Miles continued testifying to the following. When they arrived at Tedman Court they encountered a group of people. Miles knew them by name and/or street name; the group included "Michi"/Demetruis, Roy Killings ("Killings"), Darius Corlew ("Corlew"); and "New York"/Tyrone Francis ("Francis"). Everyone talked for about 15 minutes and Corlew stated that he felt threatened because Appellant was standing by him with a gun; Appellant told Corlew he was not threatening him. No one else in the group had a gun. An argument ensued and Appellant pulled out the gun and cocked it. After cocking the gun, Appellant told Corlew that now he was threatening him and when Corlew started walking towards Francis' apartment screen door Appellant fired the gun. Appellant pointed the gun directly at Corlew and fired, with only two to three feet in between them. Once Appellant started firing everyone ran. Appellant fired the gun until it was empty. Miles and Appellant then fled the scene and ran to Miles' aunt's house. Miles did not see Appellant's gun after they arrived at his aunt's apartment. While running Miles and Appellant threw their coats off. When they arrived at Miles' aunt's apartment they encountered a family friend, asked for a ride out of the area, and a neighbor gave them a ride to Lorain. During the ride, Appellant's pager went off and he used the neighbor's cell phone. The neighbor dropped Appellant off at a family member's house and then dropped Miles off at his mother's house. Miles told his mother what had happened and spoke with his father, who informed Miles that the police were looking for him and he needed to turn himself in. Miles then went to the Elyria Police Station.
 {¶ 16} Miles testified to the following on cross-examination. Miles had several conversations with the police about what happened on October 26, 2003 and they questioned the accuracy of some of his statements. Wilkes Villa is a high drug and crime area. Miles denied that Appellant's coat was the "dope coat," which is the coat the dope dealer wears. About two or three weeks prior to the shooting Appellant was robbed at gun point in Wilkes Villa. Appellant was not wanted around Wilkes Villa. Miles denied disposing of Appellant's gun after the shooting, but he did admit firing into the air prior to the shooting. Prior to the argument between Corlew and Appellant, Francis went into his apartment; Corlew had opened the door to enter the apartment when Appellant began firing. When he spoke with the police, Miles told them Appellant either shot Corlew because he was drunk or scared that Corlew was going to get a gun.
 {¶ 17} Miles testified on re-direct examination that he did not fire the gun by Mason's apartment and that Corlew had his back to Appellant when Appellant shot him.
 {¶ 18} Jamie Leticia Williams ("Williams"), a seventh grader, testified to the following for the State. She witnessed the shooting at Ledman Court and identified Appellant as the shooter. She saw Appellant talking with someone, pull a gun, and start shooting.
 {¶ 19} On cross-examination Williams testified that she saw two people with guns and only Appellant fired a gun.
 {¶ 20} Demetrius Martel Tarrant ("Tarrant") testified to the following for the State. He was present on Tedman Court when Corlew and Francis were shot. He saw Appellant and Miles approaching and noticed Appellant loading and cocking a gun and then "put [the gun] in his pants." Corlew told Appellant he felt threatened by him having a gun and Appellant told him he wasn't threatening him, but Corlew still felt threatened. Appellant said if he pulled out the gun he was going to use it. Corlew told him to go somewhere else with the gun. Tarrant then saw Appellant pull the gun out and fire. No one else had a gun that night. The shooting occurred as Corlew was going into the apartment and Francis was coming out; both men were shot.
 {¶ 21} Tarrant testified to the following on cross-examination. Appellant was the only person with a gun. There was tension between Appellant and Corlew. Tarrant denied Killings ditched a gun as they ran from the shooting.
 {¶ 22} On re-direct examination, Tarrant testified that when Appellant approached the group that night, Corlew told him that he had already seen Appellant that evening and yelled at him for shooting at the clouds.
 {¶ 23} Dr. Matus, the Lorain County Coroner, performed the autopsies on Corlew and Francis and testified to the following. Francis died from a single gunshot wound and Corlew was shot four times and died as a result of his injuries.
 {¶ 24} Detective Scott L. Willis of the Elyria Police Department ("EPD") testified to the following. Six shell casings were located outside Corlew's apartment. He recovered a red jacket about a half mile from the crime and it tested positive for gunshot residue. He also identified a red leather jacket that Miles had turned into the police. No gunshot residue was found on the hands of Corlew or Francis.
 {¶ 25} Killings testified to the following for the State. At the time of the shooting he was living in Wilkes Villa. When Appellant approached the group outside Francis' apartment, Corlew told Appellant to put the gun away or leave. Appellant then pulled the gun out and Corlew again told him to go away and attempted to enter the apartment. Appellant began firing and Corlew was shot as he attempted to enter the apartment and Francis was shot as he attempted to exit the apartment. Right before Appellant started shooting he told Corlew "Lay your bitch ass down." No one else had a gun that night.
 {¶ 26} On cross-examination, Killings testified to the following. He did not speak to the police the night of the shooting because he ran from the shootings. Killings admitted that he was currently being held in Juvenile Detention for drug trafficking. A couple weeks before the shootings, in an attempt to rob one of Killings' friends, Appellant hit Killings' friend with a beer bottle. In response, Killings, that friend, and another friend found Appellant and beat him up. One of Killings' friends stole Appellant's pager, but Killings gave it back to him. Killings denied stealing Appellant's drugs a couple days before the shootings. About 20 minutes before the shootings, Corlew told Killings that if Appellant came up with a gun, he was going to "rush him." When Appellant and Miles approached about 10-11 males were outside Francis' apartment. Appellant said something about shooting Corlew. Killings denied having a gun that night and denied pointing it at Appellant.
 {¶ 27} Killings testified on re-direct examination that Corlew and Francis were not involved in the incident where Appellant was beaten up and his pager was stolen.
 {¶ 28} Jerrod Jackson ("Jackson") testified to the following for the State. He was currently incarcerated for assaulting a police officer and intimidation. Jackson was present during the shootings and he saw Appellant approach the group outside Francis' apartment and pull out a gun and start shooting. Appellant then ran right past him and Miles ran after him; at one point Appellant turned around and "was about to fire at [Miles]" until Miles said "It's me, it's me." The two continued to run away from the scene and Jackson went to the apartment and saw Corlew on the ground. Jackson remained on the scene until the police told him to leave.
 {¶ 29} Jackson testified on cross-examination that he spoke to a police officer the night of the shootings and that he had been with the group prior to the shooting and was returning to the group when the shootings occurred.
 {¶ 30} Sade Charlton ("Charlton") testified to the following for the State. She was Appellant's girlfriend for a couple of months in 2003. After she heard about the shootings, she paged Appellant because she did not believe that he shot Corlew and Francis. Appellant called Charlton back and she asked him if he shot two people and he said no. Then she asked him if he fought with two people and he answered yes. When asked why she used the term "fight" in the conversation, Charlton explained that Appellant thought the phones were being tapped, so instead of using the word "shoot" she used the word "fight."
 {¶ 31} Charlton testified on cross-examination that during her conversation with Appellant the night of the shootings he said: "That n was coming at me crazy, and that's why I shot him."
 {¶ 32} On re-direct, Charlton testified that Appellant actually said: "That n was talking crazy, so I did what I had to do." During the investigation, Charlton told the police Appellant told her he shot Corlew because he was talking crazy. Charlton confirmed her prior statement to the police three times during re-direct examination.
 {¶ 33} After the State's exhibits were admitted into evidence, Appellant made a Crim.R. 29 motion regarding all counts in the indictment. The trial court granted Appellant's motion on count two, the aggravated murder charge for the death of Francis, and denied the motion as to the other counts.
 {¶ 34} Appellant testified on his own behalf to the following. Appellant grew up in the Lorain-Elyria area, but had been incarcerated in Nebraska prior to the shooting. He had moved back to the Wilkes Villa area around August 2003 and started selling crack cocaine. Appellant knew Corlew from before he went to Nebraska, but upon his return he had not had any direct dealings with Corlew until the shootings. Appellant began having trouble with other drug dealers in the neighborhood who were upset he was taking their clientele. He testified to the two incidents Killings described. When discussing one of the incidents, Appellant used the term "Lay your bitch ass down." During the incident when Appellant's pager was stolen, Killings' friend pointed a gun at Appellant and ordered Appellant to empty his pockets; the man also threatened to kill Appellant if he was ever in the neighborhood again. Killings later returned Appellant's pager and told him that the man who had stolen it was arrested and accused Appellant of being a "snitch."
 {¶ 35} Appellant continued his testimony, testifying to the following. A couple of days before the Wilkes Villa shootings, he was selling drugs at a gas station and a group of masked men approached him. He recognized Killings' voice and Demetrius' height, but he could not see any faces. The group brandished guns and told Appellant to give them "all of his shit." They took Appellant's drugs and told him that he did not deserve to be out there. After the gas station incident, Appellant bought a gun to "[p]rotect [himself]."
 {¶ 36} Appellant testified to the following regarding the shootings. During the late afternoon, he and Miles were hanging out, drinking and shooting his gun. Appellant needed to visit a friend about a potential job, so the two decided to walk to Appellant's friend's house. Appellant was wearing his red jacket, previously identified as the one police found on the ground, and had his gun "tucked away" in his pants. Miles was wearing his red leather jacket. While walking, the two came upon a group of males and Appellant recognized Killings, Corlew, and Demetrius. Appellant shook hands with the males, except when he went to shake Corlew's hand Corlew just "stood there." Corlew then "jumped" in Appellant's face saying: "You think you're hard with that gun, you bitch ass n, you ain't hard." Then the group started spreading out, "surrounding" Appellant and he felt it was time to leave. Corlew was about one to two feet away from Appellant when he was yelling at him. Prior to Corlew yelling at him, Appellant informed Corlew that he had a gun. Appellant attempted to walk away and Corlew cut him off saying: "I feel threatened because you standing right here. You know what I do to mother? I should kill your bitch ass, you're a bitch, you're a bitch." Appellant responded: "Man, I ain't threaten you, I ain't threaten you, I ain't threaten you." Corlew "started pulling for his gun" and Appellant pulled out his and fired as he ran away. He saw Killings had his gun drawn, but it did not fire. Appellant did not see Corlew with a gun, but he "knew he had one." Appellant felt "scared" when Corlew confronted him. He shot his gun because Corlew "was about to kill [him]." When he was running away he turned around and noticed someone running behind him, Miles identified himself and the two continued running. Appellant threw off his coat because he didn't want to be spotted by the group of males. Miles told Appellant to give him the gun, which he did, and Miles threw it. Appellant and Miles got a ride to Lorain. Appellant visited his grandmother and learned that he had shot two people. His grandmother told him to turn himself in to the police and he did.
 {¶ 37} Appellant testified to the following on cross-examination. Appellant admitted that selling drugs and buying and carrying a gun violated the laws of Ohio and his parole conditions from Nebraska. He admitted arming himself with the gun and test firing it to ensure that it worked properly. Appellant carried the gun for about two to three days before shooting Corlew and Francis. He denied trying to steal Mason's light bulb and firing the gun after attempting to steal the light bulb. Appellant had never had any problems with Mason. Appellant was a couple of feet away from Corlew when Appellant fired the first shot and he continued to shoot as he ran away. Appellant fired the gun with his left hand and as he ran he moved his left arm under his right underarm, across his body, and continued firing, not looking where he was shooting, but hitting his target several times. Appellant admitted that when he fired the first shot at Corlew, Corlew did not have a weapon in his hands. Appellant chose to approach Corlew and the other males even though he had recent run-ins with some of the males in the group.
 {¶ 38} Appellant testified on re-direct examination that he fired the gun because he feared for his life.
 {¶ 39} After completing his testimony, Appellant rested his case and renewed his Crim.R. 29 motion, which the trial court denied.
 {¶ 40} After careful review of the entire record, weighing the evidence and all reasonable inferences and considering the credibility of the witnesses, this Court cannot conclude that the trial court clearly lost its way when it found Appellant guilty of murder and felonious assault. The trial court was in the best position to evaluate the credibility of witnesses and give proper weight to their testimony. See State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. Appellant's conviction was not against the manifest weight of the evidence simply because the jury chose to believe the testimony of the State's witnesses. State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4. Moreover, "in reaching its verdict, the jury is free to believe all, part, or none of the testimony of each witness." Prince v. Jordan, 9th Dist. No. 04CA008423,2004-Ohio-7184, at ¶ 35, citing State v. Jackson (1993),86 Ohio App.3d 29, 33. As the factfinder, the jury was entitled to reconcile any differences and inconsistencies in the testimony and determine that the manifest weight of the evidence supported a finding of guilt. See DeHass, supra.
 {¶ 41} Based on the foregoing, this Court cannot find that Appellant's convictions were against the manifest weight of the evidence. Furthermore, as previously stated, "a determination that [a] conviction is supported by the weight of the evidence [is] also * * * dispositive of the issue of sufficiency."Roberts, supra at 4. Accordingly, having found that Appellant's convictions were not against the manifest weight of the evidence, this Court need not discuss further his challenge to the sufficiency of the evidence. Thus, we find that the trial court did not err when it denied Appellant's motion for acquittal. Appellant's first and second assignments of error lack merit.
 Assignment of Error Number Three
"THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING APPELLANT'S MOTION TO CHANGE VENUE[.]"
 {¶ 42} In his third assignment of error, Appellant has argued that the trial court abused its discretion when it denied his motion for a change of venue. Specifically, Appellant has argued that pre-trial publicity tainted the potential jurors. We disagree.
 {¶ 43} Pursuant to Crim.R. 18(B), a trial court "may transfer an action to any court having jurisdiction of the subject matter outside the county in which trial would otherwise be held, when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." Crim.R. 18(B); see also, R.C. 2901.12(K). Whether to order a change of venue "rests largely in the discretion of the trial court, and * * * appellate courts should not disturb the trial court's ruling * * * unless it is clearly shown that the trial court had abused its discretion." State v. Maurer (1984), 15 Ohio St.3d 239, 250, certiorari denied (1985), 472 U.S. 1012, 105 S.Ct. 2714,86 L.Ed.2d 728, quoting State v. Fairbanks (1972),32 Ohio St.2d 34, 37. See also, State v. Lee (Aug. 22, 1990), 9th Dist. No. 90CA004749, at 2-3. Crim.R. 18(B) does not require transfer merely because of extensive pre-trial publicity. State v.Lynch, 98 Ohio St.3d 514, 2003-Ohio-2284, at ¶ 34. A defendant wishing to transfer venue based on pre-trial publicity must show that one or more of the jurors were actually biased. State v.Treesh (2001), 90 Ohio St.3d 460, 464.
 {¶ 44} During the pre-trial process, Appellant filed a motion for a change of venue. Appellant alleged that the media had tainted the potential jury pool by releasing stories with prejudicial information and distorted facts. On May 18, 2004, a hearing was held on the motion and Appellant requested that the motion be held in abeyance until voir dire. The trial court denied the request to hold the motion in abeyance and informed Appellant that he could renew his motion for change of venue during jury selection. The trial court found Appellant's motion premature and overruled it. Appellant did not renew his motion before, during, or after voir dire.
 {¶ 45} A review of the hearing reveals that no evidence was presented to show that a fair and impartial trial could not be held in Lorain County. Appellant failed to present any evidence of prejudicial pre-trial publicity or demonstrate that one or more of the jurors were actually biased. Accordingly, we find that the trial court did not abuse its discretion in denying Appellant's motion for a change of venue. Appellant's third assignment of error lacks merit.
 Assignment of Error Number Four
"APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL[.]"
 {¶ 46} In his fourth assignment of error, Appellant has argued that he was denied the effective assistance of trial counsel. Specifically, Appellant has argued that his counsel was ineffective because his counsel only called one witness, Appellant, for the defense and he failed to present evidence on Appellant's self-defense theory. We disagree.
 {¶ 47} Appellant bears the burden of proof in a claim of ineffective assistance of counsel. State v. Colon, 9th Dist. No. 20949, 2002-Ohio-3985, at ¶ 49. Appellant must overcome the strong presumption that counsel's performance was adequate and that counsel's action might be sound trial strategy. State v.Smith (1985), 17 Ohio St.3d 98, 100. Furthermore, an attorney properly licensed in Ohio is presumed competent. State v. Lott
(1990), 51 Ohio St.3d 160, 174, certiorari denied (1990),498 U.S. 1017, 111 S.Ct. 591, 112 L.Ed.2d 596.
 {¶ 48} In order to overcome his burden and establish an ineffective assistance of counsel claim, Appellant must satisfy a two-prong test. First, Appellant must demonstrate that trial counsel's performance was deficient. Strickland v. Washington
(1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. To establish a deficiency, Appellant must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed Appellant by the Sixth Amendment. Id. Appellant must identify the acts or omissions of his attorney that he claims were not the result of reasonable professional judgment. State v. Palmison, 9th Dist. No. 20854, 2002-Ohio-2900, at ¶ 31. This Court must consider the facts of this particular case as they existed at the time of trial counsel's conduct and then we must decide whether counsel's conduct fell outside the range of that which is considered professionally competent. Id.
 {¶ 49} To prove his claim of ineffective assistance of counsel Appellant must also demonstrate that he was prejudiced by his trial counsel's deficient performance. Id. at ¶ 30. Prejudice entails "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different."State v. Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus, certiorari denied (1990), 497 U.S. 1011,110 S.Ct. 3258, 111 L.Ed.2d 768. This requires a showing that counsel's errors were so serious as to deprive Appellant of a fair trial.Strickland, 466 U.S. at 686-687.
 {¶ 50} After reviewing the record and Appellant's brief, we find that Appellant has not provided sufficient evidence to contradict that his trial counsel's performance was adequate and that counsel's action, as well as inaction, was sound trial strategy under the circumstances of the case. Moreover, we will not second-guess Appellant's trial counsel's decision not to call additional witnesses. The record reveals that Appellant's counsel listed six individuals in discovery responses as potential witnesses for Appellant. Such evidence shows that Appellant's counsel was aware of potential witnesses and made a decision not to call them as witnesses. Appellant has not alleged that any of the witnesses that he argues should have been called were present during the shooting; he only claims that they "lived in close proximity" to the people involved. Moreover, one of the witnesses Appellant listed as a potential witness on his behalf, Charles Mason, was called by the State and cross-examined by the defense. Appellant has provided no evidence that his counsel failed to call a witness that would have supported his self-defense claim.
 {¶ 51} Based on the foregoing, this Court finds that Appellant has not demonstrated that a failure to call additional witnesses was deficient lawyering or anything other than a sound trial strategy. We further find that Appellant has not demonstrated that the outcome of the trial would have been different had additional witnesses testified on his behalf. Appellant's fourth assignment of error is without merit.
 III {¶ 52} Appellant's four assignments of error are overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Carr, J., Moore, J., concur.