JOURNAL ENTRY and OPINION
{¶ 1} Appellant Marvin Congress appeals his convictions and sentence for two counts of felonious assault. Congress assigns the following errors for our review:
"I. Defendant was denied his right of confrontation and crossexamination when the court allowed medical records into evidencein the absence of any testimony and a non-testifying allegedvictim."
 "II. Defendant was denied due process of law by reason ofimproper cross-examination during defendant's testimony."
 "III. Defendant was denied due process of law when he was notgranted a dismissal and discharge."
 "IV. Defendant was denied due process of law when the trialcourt overruled a motion for judgment of acquittal."
 "V. Defendant was denied effective assistance of counsel."
 "VI. Defendant was denied due process of law when he wassentenced to more than the minimum sentence."
 {¶ 2} Having reviewed the record and pertinent law, we affirm the trial court's decision convicting Congress, and vacate and remand his sentence in light of State v. Foster.[1] The apposite facts follow.
 {¶ 3} The Cuyahoga County Grand Jury indicted Congress for offenses arising out of a shooting at the G-Spot Lounge in Cleveland, Ohio on October 13, 2004. The grand jury indicted Congress for two counts of felonious assault. Both counts had one and three-year gun specifications attached. Congress pled not guilty at his arraignment. On April 18, 2005, the matter proceeded to a jury trial.
 Jury Trial {¶ 4} The State presented six witnesses including Timothy Fluker who testified that on October 13, 2004, he was working as a security guard at the G-Spot Lounge. Fluker testified that a fight erupted between two men inside the bar. He removed the two men, but several men followed them outside, and the fighting continued. After a short while, the fighting ended, and the people dispersed.
 {¶ 5} Fluker testified that when the fighting ended he went back inside the bar. About five minutes later he heard gunfire, which sounded as if it was coming from down the street. Fluker described the ensuing events as follow:
"So when I stepped out, people were running. I saw Marvinrunning towards the bar. I assumed that he was running for cover.I assumed that he was running from whoever was shooting. I didn'tsee the pistol he had. He had it down — He had it down by hisside. And I was looking around. And he got maybe two or threefeet from me, from the entrance of the bar, and he raised apistol, and fired once. I grabbed him, and somebody else grabbed.I'm not sure who, but I know somebody else was helping me. Andthe gun went off like two more times before I wrestled it out ofhis hand. He jumped up and ran, and I looked in the bar to seewho was hit."[2]
 {¶ 6} Fluker testified that he reentered the bar to discover that a patron, DeShawn Laster, had been shot in the face. First aid was administered to Laster while they waited for the emergency medical services to arrive. Fluker stated that when the police arrived, he described the sequence of events and told them Congress was the shooter.
 {¶ 7} Fluker finally testified that at the time of the incident he had been working as a security guard for three-to-four months, and that Congress came in about every other weekend. Fluker stated that he spoke with Congress every time he visited the lounge, and had spoken with him earlier that evening.
 {¶ 8} Congress testified that on October 12, 2004, he went to the G-Spot Lounge at approximately 9:30 p.m. He was at the Lounge for more than an hour. He left with his two friends, Albert and Pookie, drove back to his neighborhood, and spent the rest of the time talking until three in the morning.
 {¶ 9} Congress also testified that he left the G-Spot Lounge before the aforementioned altercation and denied any involvement in the shooting.
 {¶ 10} The defense called the victim, DeShawn Laster, to testify. Laster testified that the person who shot him was more than six feet tall, had braided hair, and was of light complexion. He stated that he did not see Congress in the G-Spot Lounge on the night he was shot. He also stated that the first time he saw Congress was during the instant proceedings.
 {¶ 11} On April 20, the jury returned guilty verdicts on both counts of the indictments, along with the gun specification. On May 16, 2005, the trial court sentenced Congress to concurrent prison term of three years on the two counts of felonious assault. Further, the trial court merged the one and three-year gun specifications. Finally, the trial court imposed the three-year gun specification to be served consecutively to the underlying felonious assault charges.
 Confrontation Clause {¶ 12} In the first assigned error, Congress argues that the admission of the victim's medical records into evidence violates the Confrontation Clause of the Sixth Amendment to the U.S. Constitution. We disagree.
 {¶ 13} The Confrontation Clause of the Sixth Amendment, as applied to the states through the Fourteenth Amendment, guarantees a defendant the right to confront witnesses against him in both state and federal criminal prosecutions.[3]
 {¶ 14} As a general rule, authenticated hospital records are admissible at trial.[4] Pursuant to R.C. 2317.422, hospital records may be authenticated via certification by the custodian of the records rather than by live testimony at trial as to their preparation. Admission of hospital records via R.C. 2317.422
certification does not offend a defendant's confrontation rights.[5]
 {¶ 15} Here, it is undisputed the contested medical records had the certification required by R.C. 2317.422. Thus, testimony of the preparer would have added little or nothing to the trial record. Additionally, there is no hearsay issues with admitting the medical records, because the record before us reveals the victim, Laster, did not know who shot him. In fact, Laster testified that the Congress was not the person who shot him; thus there would be no need to cross-examine him. Further, Fluker, the individual who accused and identified Congress as the person who shot Laster, was available for cross-examination.
 {¶ 16} Finally, Congress called Laster as a witness, and he testified on cross-examination that the medical records the State introduced were his. Thus, any perceived error was cured when Congress called Laster as a witness and he confirmed the records were his. We conclude the admission of Laster's medical records did not violate the Confrontation Clause, nor did it prejudice Congress. Accordingly, we overrule the first assigned error.
 Cross-Examination {¶ 17} In the second assigned error, Congress argues he was denied a fair trial because of improper cross-examination. We disagree.
 {¶ 18} Pursuant to Evid.R. 611(A), a trial court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence[.]" Cross-examination shall be permitted on all relevant matters and matters affecting credibility.[6] Wide latitude is allowed on cross-examination. Cross-examination is invaluable because it is used as a method of testing the accuracy, truthfulness and credibility of testimony.[7]
 {¶ 19} The trial court may impose reasonable limits on cross-examination based on a variety of concerns, such as harassment, prejudice, confusion of the issues, the witness's safety, repetitive testimony, or marginally relevant interrogation.[8] The limitation of cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. Such exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion.[9] An abuse of discretion means more than an error of judgment; it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable.[10] When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court.[11]
 {¶ 20} In the instant case, Congress cites four instances where he alleges the State improperly cross-examined him, namely: (1) that he knew the police were looking for him, (2) that his mother told him that the police said he had a gun, (3) that others were saying that he was involved in the shooting, and (4) that he was drunk and driving around with his friends. A review of the record indicates that the four instances that Congress cites were raised in response to his testimony.
 {¶ 21} First, Congress testified his mother told him the police came to the house and said he had a gun.[12] Based on the testimony of Congress, he knew or had reason to know the police were looking for him and they thought he had a gun.
 {¶ 22} Second, the record reveals the trial court sustained defense counsel's objection to any cross-examination regarding what other people were saying about Congress' involvement in the shooting. Thus, the instant allegation is without merit. The following exchange took place outside the presence of the jury:
"Mr. Golish: Judge, the defendant in this case was arrestedfor a CCW, during which period he was wearing a bulletproof vest.He was asked why he was wearing a bulletproof vest, and hestated, `because everybody thinks I shot DeShawn Laster at thatbar.' That's why he was wearing a bulletproof vest when he wasarrested on the CCW.
 The Court: All, right, I'm going to sustain the objection toany testimony regarding his arrest for a CCW for which he hasn'tbeen tried yet or convicted. As far as —
 Mr. Golish: But his statement —
 The Court: I'm telling you I'm sustaining the objection,because any testimony there would be far more prejudicial thanany probative value that might be brought out.
"* * *
"The Court: All right. Anyway, to get to the point, you maycross-examine him from anything he said regarding this case, butyou may not cross-examine him from anything regarding the CCWcase, including the fact that at the time of his arrest on theCCW that he had a bullet proof vest on."[13]
 {¶ 23} Fourth, regarding the perceived improper allegation that he was drunk and driving around with his friends, Congress testified as follows:
"Q. So you guys were — you said — were you drunk when you leftthe G-Spot Lounge?
 A. We went there, we was drinking. I ain't going to say I wasdrunk.
 Q. How many drinks did you have?
 A. Probably about two, three.
 Q. What were you drinking?
 A. Grey Goose.
 Q. Vodka?
 A. Yes, sir.
 Q. What kind of drink were you drinking, like a vodka andtonic, or martini, vodka martini?
 A. Just vodka and cranberry juice, sir.
 Q. Vodka and cranberry?
 A. Yes.
 Q. Big, tall glass?
 A. No, sir.
 Q. And you were with Pookie and Albert.
 A. Yes, sir.[14]
 {¶ 24} As can be surmised from the excerpt above, and elsewhere in the record, the instances that Congress perceives as improper cross-examination by the State, were in response to the testimony he provided. As such, the cross-examination was proper. Accordingly, we overrule the second assigned error.
 Judgment of Dismissal {¶ 25} In the third assigned error, Congress argues the State presented insufficient evidence to convict him because the victim did not identify him as the assailant. We disagree.
 {¶ 26} A challenge to the sufficiency of evidence supporting a conviction requires the appellate court to determine whether the State met its burden of production at trial.[15] On review for legal sufficiency, the appellate court's function is to examine evidence admitted at trial and determine whether such evidence, if believed, would convince the average person of the defendant's guilt beyond a reasonable doubt.[16] In making its determination, an appellate court must view the evidence in a light most favorable to the prosecution.[17]
 {¶ 27} In the instant case, despite the victim's failure to identify Congress as the individual who shot him, Fluker, unequivocally identified Congress. Fluker testified he had worked at the G-Spot Lounge for approximately three months. During that time, Congress visited the lounge every other weekend, and they always spoke to each other. On the night of the shooting, Congress visited the Lounge and they spoke with each other. Additionally, Fluker described the events of that night and detailed how he struggled with Congress for the gun that was eventually discharged three times. Further, Fluker testified that upon the arrival of the police, he identified Congress as the shooter.
 {¶ 28} Based on the record before this court, we conclude the State met its burden of production at trial. Fluker provided reliable testimony regarding Congress' identity. Accordingly, we overrule the third assigned error.
 Judgment of Acquittal {¶ 29} In the fourth assigned error, Congress contends he was entitled to a judgment of acquittal. We disagree.
 {¶ 30} A motion for a judgment of acquittal is properly denied when reasonable minds can reach different conclusions as to whether each material element of a crime had been proved beyond a reasonable doubt.[18]
 {¶ 31} Here, Congress argues that it was an accidental shooting, that it was a case of mistaken identity, and that the victim might have been shot from shots fired in the earlier altercation. We are not persuaded. In overruling Congress' motion for acquittal, the trial court stated:
"Now the security officer, Mr. Timothy Fluker, actually, theCourt believed from his testimony that he appears to be a veryconscientious, nice man. And however, his testimony as to — can Ibelieve he's sincerely trying to recall it, and it was consistentwith the brief statements he gave to the police, apparently isthat the defendant, who he knew and seen before, saw that night,earlier, recognized him, came down the street and pointed a gunin towards the bar, fired one shot, right next to the witnessFluker's head, and then grabbed the gun. Then they both fell overthe threshold, so to speak, into the bar, and the gun went offseveral more times. He did not see the bullet strike the victim.To be honest with you, I don't have a clue whether the first shothit the victim, third shot, fourth shot, whatever, only that thegun went off, and it kept firing as they were wrestling. And thegun finally fell out of the defendant's hand. So I believe —first of all, I believe that reasonable minds could very welldiffer in this case, but that is a question of fact for thejury."[19]
 {¶ 32} The above excerpt dispels the notion the shooting was accidental. Fluker wrestled with Congress to prevent him from firing into the bar. Congress fired approximately three or four shots, one of which hit the victim in the head, before Fluker disarmed him. The above excerpt also dispels the notion this was a case of mistaken identity. Fluker unequivocally identified Congress as the shooter. Fluker knew Congress because of his frequent visits to the G-Spot Lounge, at which time both men spoke with each other. Further, Fluker spoke with Congress in the bar earlier that night.
 {¶ 33} Finally, Congress' argument the victim could have been shot as a result of shots fired from the earlier altercation is also without merit. Fluker testified after the earlier altercation ended and the people dispersed, he went back inside the bar. Approximately five minutes later he heard gunshots that sounded as if they were coming from down the street. It was at this time he went outside the bar to investigate, and saw Congress running towards the bar. We conclude the aforementioned testimony, if believed, would dispel the notion the victim was injured by shots fired in the earlier altercation.
 {¶ 34} We find, based on the record before us, that reasonable minds could reach different conclusions as to whether each material element of the charged crime had been proven beyond a reasonable doubt. As a result, the trial court properly denied Congress' motion for acquittal. Accordingly, we overrule the fourth assigned error.
 Ineffective Assistance of Counsel {¶ 35} In the fifth assigned error, Congress contends he was denied the effective assistance of counsel because his attorney failed to get a jury instruction on accident, failed to file a motion to suppress, and failed to request a jury instruction on identification. We disagree.
 {¶ 36} In order to prevail on a claim of ineffective assistance of counsel, the appellant must show trial counsel's performance fell below an objective standard of reasonableness and such performance resulted in undue prejudice.[20] An essential element of an ineffective assistance of counsel claim is a showing that, but for trial counsel's alleged errors, there is a substantial probability that the outcome of the trial would have been different.[21]
 {¶ 37} In the instant case, in order for Congress' trial counsel to request a jury instruction on accident, he would have had to have argued Congress had accidentally shot the victim. However, throughout the trial, Congress' counsel argued, and maintained Congress was neither present, nor the person who fired the shot which injured the victim.
 {¶ 38} Additionally, trial counsel would have faced the same issue if he requested a jury instruction on identification. We have previously found Fluker unequivocally identified Congress as the shooter. Further, during closing argument, Congress argued Fluker was lying, not mistaken about the identity of the shooter.[22]
 {¶ 39} We also conclude Congress' assertion trial counsel was ineffective for failing to file a motion to suppress eyewitness identification is without merit.
 {¶ 40} When a witness has been confronted with a suspect before trial, due process requires a court to suppress an identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances.[23] However, no due process violation will be found where an identification does not stem from an impermissibly suggestive confrontation, but is instead the result of observations at the time of the crime.[24]
 {¶ 41} The United States Supreme Court developed a two-step process in determining the reliability of the eyewitness identification process.[25] This two-step process initially requires the appellant prove the identification procedure used was unnecessarily and impermissibly suggestive. The Supreme Court held the trial court must then balance the suggestiveness of the identification procedure against the following factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.[26]
 {¶ 42} Here, having previously addressed Fluker's unequivocal identification of Congress, we conclude that it comports with the factors set forth by the Supreme Court. Therefore, we find no error in counsel's failure to file a motion to suppress Fluker's identification of Congress. Further, we find Congress has not met the high burden of demonstrating his trial counsel was ineffective; nor has he demonstrated how the outcome of the trial would have been different but for trial counsel's alleged errors. Accordingly, we overrule the fifth assigned error.
 Minimum Sentence {¶ 43} In the sixth assigned error, Congress argues the trial court erred in imposing more than the minimum sentence because he had not previously served a prison term. We agree based on the Ohio Supreme Court's recent decision in State v.Foster.[27]
 {¶ 44} In the instant case, the trial court imposed more than the minimum sentence after making findings pursuant to the provisions of R.C. 2929.14(B), which the Ohio Supreme Court has since declared unconstitutional and excised from the statutory scheme.[28] As a result, "[t]rial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings and give reasons for imposing maximum, consecutive or more than the minimum sentence."[29] Nevertheless, defendants that were sentenced under unconstitutional and now void statutory provisions must be re-sentenced.[30]
 {¶ 45} Pursuant to the mandates of Foster, we sustain the sixth assigned error, vacate Congress' sentence and remand this matter to the trial court for re-sentencing.
Conviction affirmed, sentence vacated and remanded for re-sentencing.
It is ordered that appellee and appellant share the costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Sweeney, P.J., and Karpinski, J., concur.
[1] ___ Ohio St.3d ___, 2006-Ohio-856.
[2] Tr. at 186-187.
[3] Delaware v. Van Arsdall (1986), 475 U.S. 673, 679;89 L.Ed.2d 674, 106 S.Ct. 1431.
[4] Hunt v. Mayfield (1989), 65 Ohio App.3d 349.
[5] State v. Spikes (1981), 67 Ohio St.2d 405.
[6] Evid.R. 611(B).
[7] State v. Slagle (June 14, 1990), Cuyahoga App. No. 55759.
[8] State v. Treesh (2001), 90 Ohio St.3d 460, 480-81, citingDelaware v. Van Arsdall (1986), 475 U.S. 673, 679,89 L.Ed 2d 674, 683, 106 S.Ct. 1431.
[9] State v. Acre (1983), 6 Ohio St.3d 140, 145.
[10] Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
[11] Freeman v. Crown City Mining, Inc. (1993),90 Ohio App.3d 546, 552.
[12] Tr. at 379.
[13] Tr. at 361-362.
[14] Tr. at 367.
[15] State v. Thompkins (1997), 78 Ohio St.3d 380.
[16] Id.; State v. Fryer (1993), 90 Ohio App.3d 37.
[17] Id. at 43.
[18] State v. Nelson (Feb. 25, 1999), Cuyahoga App. No. 73289, citing State v. Beaver (1997), 119 Ohio App.3d 385, 390, appeal dismissed (1997), 79 Ohio St.3d 1504.
[19] Tr. at 339-340.
[20] State v. Madrigal, 87 Ohio St.3d 378, 397, 2000-Ohio-448, reconsideration denied (2000), 88 Ohio St.3d 1428, citing Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052, 2064, 80 L.Ed.2d 674; State v. Bradley (1989),42 Ohio St.3d 136, paragraphs two and three of the syllabus, certiorari denied (1990), 497 U.S. 1011, 110 S.Ct. 3258,111 L.Ed.2d 768.
[21] State v. Lindsey, 87 Ohio St.3d 479, 489, 2000-Ohio-465, reconsideration denied (2000), 88 Ohio St.3d 1438.
[22] Tr. at 424-428.
[23] State v. Waddy (1992), 63 Ohio St.3d 424, 438, citingManson v. Brathwaite (1977), 432 U.S. 98, 53 L.Ed.2d 140,97 S.Ct. 2243, and Neil v. Biggers (1972), 409 U.S. 188, 196-198,34 L.Ed.2d 401, 93 S.Ct. 375.
[24] Coleman v. Alabama (1970), 399 U.S. 1, 5-6,26 L.Ed.2d 387, 90 S.Ct. 1999.
[25] Manson v. Brathwaite and Neil v. Biggers, supra.
[26] State v. Sanders (June 15, 1989), Cuyahoga App. 55524, at 7.
[27] ___ Ohio St.3d ___, 2006-Ohio-856.
[28] Foster at ¶¶ 1-4, applying United States v. Booker
(2005), 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621; Blakely v.Washington (2004), 542 U.S. 296, 124 S. Ct. 2531,159 L. Ed. 2d 403 and Apprendi v. New Jersey (2000), 530 U.S. 466,120 S.Ct. 2348, 147 L.Ed.2d 435.
[29] Foster, at paragraph 7 of the syllabus and State v.Mathis ___ Ohio St.3d ___, 2006-Ohio-855, paragraph 3 of the syllabus.
[30] Foster, 2006-Ohio-856, ¶¶ 103-106.